No. 23-3709

# UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

Nikki Steiner Mazzocchio and Angela Steiner Kraus,
*Plaintiffs-Appellees,*
v.
Cotter Corporation, Commonwealth Edison Company, and St. Louis Airport
Authority, A Department of the City of St. Louis,
*Defendants-Appellants,*
DJR Holdings, Inc., formerly known as Futura Coatings, Inc.,
*Defendant.*

Appeal from the United States District Court for the Eastern District of Missouri –
St. Louis, No. 4:22-cv-00292-MTS, The Honorable Matthew T. Schelp

# OPENING BRIEF OF APPELLANTS
# COTTER CORPORATION (N.S.L.); COMMONWEALTH
# EDISON COMPANY; AND ST. LOUIS AIRPORT AUTHORITY,
# A DEPARTMENT OF THE CITY OF ST. LOUIS

RILEY SAFER HOLMES & CANCILA LLP
Brian O. Watson
Lauren E. Jaffe
Lucas Rael
70 W. Madison St., Suite 2900
Chicago, IL 60602
(312) 471-8700

Jennifer Steeve
E. Ashley Paynter
100 Spectrum Center Dr., Suite 650
Irvine, CA 92618
(949) 359-5515

Attorneys for *Appellants
Cotter Corporation (N.S.L.);
Commonwealth Edison Company*

ARMSTRONG TEASDALE LLP
Laura A. Bentele
Corey A.-T. Stegeman
7700 Forsyth Blvd., Suite 1800
St. Louis, Missouri 63105
(314) 621-5070

Attorneys for *Appellant St. Louis Airport
Authority, A Department of the City of St.
Louis*

## SUMMARY OF THE CASE

The district court's order allowing the regulation of nuclear safety through state tort law contravenes Supreme Court and Eighth Circuit precedent and the express language and purposes of the Price-Anderson Act ("PAA"), 42 U.S.C. § 2010, *et seq.*, which require "federal occupancy of regulations over all radiation hazards." *N. States Power Co. v. Minn.*, 447 F.2d 1143, 1150 (8th Cir. 1971), *aff'd sub nom. Minn. v. N. States Power Co.*, 405 U.S. 1035 (1972).

As this Court has held, the PAA "incorporate[s] state law only to the extent consistent with the Act." *Halbrook v. Mallinckrodt, LLC*, 888 F.3d 971, 977 (8th Cir. 2018) (analyzing 42 U.S.C. §§ 2014(hh), 2210(n)(2)). And every Circuit to decide the standard of care in a PAA "public liability action"—the federal claim for personal injury or property damage arising from federally regulated nuclear material—has held that federal regulations set the standard of care because "the federal government has occupied the entire field of nuclear safety concerns." *Pac. Gas & Elec. Co. v. State Energy Res. Conserv. & Dev. Comm'n*, 461 U.S. 190, 212–13 (1983).

The district court's order should be reversed with instructions to dismiss the complaint because federal regulations—specifically the federal radiation dose levels—provide the exclusive standard of care in a PAA public liability action.

## STATEMENT CONCERNING ORAL ARGUMENT

Appellants request 20 minutes of oral argument per side due to the complex history in these proceedings.

## APPELLANT COTTER CORPORATION (N.S.L.)'S
## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Local

Rule 26.1A of the United States Court of Appeals for the Eighth Circuit, Appellant

Cotter Corporation (N.S.L.) certifies that:

1.      Cotter Corporation (N.S.L.) is a wholly owned subsidiary of General

Atomics Uranium Resources, LLC.

2.      No publicly held corporation owns 10% or more of Cotter

Corporation's (N.S.L.)'s stock.


By: */s/ Jennifer Steeve*

## APPELLANT COMMONWEALTH EDISON COMPANY'S
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Local Rule 26.1A of the United States Court of Appeals for the Eighth Circuit, Appellant Commonwealth Edison Company certifies that:

1.    Commonwealth Edison Company is a wholly owned subsidiary of Exelon Energy Delivery Company, LLC.

2.    No publicly held corporation owns 10% or more of Commonwealth Edison Company's stock.


By: */s/ Jennifer Steeve*

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE CASE ................................................................ i

STATEMENT CONCERNING ORAL ARGUMENT ........................... i

CORPORATE DISCLOSURE STATEMENTS ........................... ii–iii

JURISDICTIONAL STATEMENT ....................................................1

STATEMENT OF ISSUES .............................................................2

STATEMENT OF THE CASE ..........................................................3

I.      Facts.. ..............................................................................3

        A.      The Manhattan Project and the St. Louis Sites ..............3

        B.      Cotter ...............................................................3

        C.      ComEd .............................................................5

        D.      St. Louis Airport Authority ..................................5

II.     Procedural History............................................................5

        A.      The Removal......................................................5

        B.      The Operative Complaint.....................................6

        C.      The District Court's Dismissal Order.........................7

        D.      The District Court's Order Certifying Interlocutory Appeal......7

        E.      The Petition for Permission to Appeal.......................8

III.    Regulatory Background........................................................8

        A.      The Atomic Energy Act and the Price-Anderson Act...............8

        B.      The Federal Regulations ....................................13

IV.     Related Litigation ..........................................................16

    A.     *McClurg*.......................................................................16

    B.     *Banks* ........................................................................17

    C.     *Kitchin* ......................................................................18

SUMMARY OF THE ARGUMENT ...............................................20

ARGUMENT .................................................................................23

I.     The Standard of Review Is *De Novo*...................................... 23

II.    Federal Safety Regulations Create the Exclusive Standard of Care in a Price-Anderson Act Public Liability Action. .......................................................... 23

    A.     Congress created the PAA public liability action within a comprehensive, preemptive regulatory structure......................................25

    B.     The PAA's text and framework confirm the preemption of inconsistent state law standards....................................................28

    C.     The federal regulations that set the standard of care for a PAA public liability action uniformly implement the purposes of the Atomic Energy Act and PAA. .......................................................30

    D.     Deciding the standard of care on a defendant-by-defendant basis destroys the uniformity required to further the purposes of the Atomic Energy Act and PAA. .......................................................31

III.   The Circuits—Consistent with this Court's Precedents—Have Uniformly Held that Federal Nuclear Safety Standards Preempt State Standards of Care in a Price-Anderson Act Public Liability Action. ......................................... 33

IV.   Plaintiffs Must Allege Plausible Facts Showing a Breach of the Federal Dosage Regulations in a Price-Anderson Act Public Liability Action. .............. 38

CONCLUSION ...............................................................................40

CERTIFICATE OF COMPLIANCE.................................................42

CERTIFICATE OF SERVICE...........................................................43

# TABLE OF AUTHORITIES

Page

C<small>ASES</small>

*Adkins v. Chevron Corp.*
960 F. Supp. 2d 761 (E.D. Tenn. 2012) ........................................................39

*Aetna Health Inc. v. Davila*
542 U.S. 200 (2004) ............................................................................... 28, 29

*Aragon v. Wal-Mart Stores*
735 F.3d 807 (8th Cir. 2013) ....................................................................23

*Ashcroft v. Iqbal*
556 U.S. 662 (2009) ...................................................................................39

*Bell Atl. Corp. v. Twombly*
550 U.S. 544 (2007) ...................................................................................39

*Butler v. Mallinckrodt LLC*
No. 4:18-CV-01701-AGF, 2022 WL 970876 (E.D. Mo. Mar. 31, 2022) ................17

*Butler v. Mallinckrodt LLC*
No. 4:18-cv-01701-AGF, 2022 WL 4598531 (E.D. Mo. Sept. 30, 2022) ...............17

*Cook v. Rockwell Int'l Corp.*
618 F.3d 1127 (10th Cir. 2010) .............................................................. 36, 37

*Cotroneo v. Shaw Env't & Infrastructure, Inc.*
639 F.3d 186 (5th Cir. 2011) .............................................................*passim*

*In re Cotter Corporation (N.S.L.)*
22 F.4th 788 (2022) ..........................................................................*passim*

*Duke Power Co. v. Carolina Envt'l Study Grp., Inc.*
438 U.S. 59 (1978) ..................................................................... 9, 10, 11, 20

*El Paso Nat. Gas Co. v. Neztsosie*
526 U.S. 473 (1999) ..........................................................................*passim*

*Farina v. Nokia Inc.*
625 F.3d 97 (3d Cir. 2010) .........................................................................31

*Geier v. Am. Honda Motor Co., Inc.*
529 U.S. 861 (2000) ........................................................................ 22, 29

*Golden v. CH2M Hill Hanford Grp., Inc.*
528 F.3d 681 (9th Cir. 2008) ...................................................................... 35

*Halbrook v. Mallinckrodt, LLC*
888 F.3d 971 (8th Cir. 2018) ........................................................... *passim*

*In re Hanford Nuclear Reserv. Litig.*
534 F.3d 986 (9th Cir. 2008) ........................................... 27, 31, 35, 38

*Kerr-McGee Corp. v. Farley*
115 F.3d 1498 (10th Cir. 1997)...................................................35, 37–38

*King v. St. Vincent's Hosp.*
502 U.S. 215 (1991) ........................................................................ 28, 29

*Kitchin v. Bridgeton Landfill, LLC*
No. 18-cv-00672, 2024 WL 379285 (E.D. Mo. Feb. 1, 2024) ............................ 18, 19

*Matthews v. Centrus Energy Corp.*
15 F.4th 714 (6th Cir. 2021)............................................................ *passim*

*McClurg v. Mallinckrodt, Inc.*
No. 4:12-CV-00361-AGF, 2015 WL 867455 (E.D. Mo. Feb. 27, 2015) ................. 16

*McClurg v. Mallinkrodt, Inc.*
No. 4:12-CV-00361-AGF, 2016 WL 6432776 (E.D. Mo. Oct. 31, 2016) ............... 16

*McClurg v. MI Holdings, Inc.*
933 F. Supp. 2d 1179 (E.D. Mo. 2013) .................................................. 16, 39

*N. States Power Co. v. Minn.*
447 F.2d 1143 (8th Cir. 1971)........................................................... *passim*

*Nieman v. NLO, Inc.*
108 F.3d 1546 (6th Cir. 1997) .................................................................... 35

*Noe v. Henderson*
456 F.3d 868 (8th Cir. 2006) ..................................................................... 23

*O'Conner v. Commonwealth Edison Co.*
13 F.3d 1090 (7th Cir. 1994) ........................................................... *passim*

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*
461 U.S. 190 (1983) ......................................................................*passim*

*Roberts v. Florida Power & Light Co.*
146 F.3d 1305 (11th Cir. 1998)........................................... 14, 35

*Robinson v. Shell Oil Co.*
519 U.S. 337 (1997) .......................................................... 28, 29

*Silkwood v. Kerr-McGee Corp.*
464 U.S. 238 (1984) ................................................................*passim*

*Skull Valley Band of Goshute Indians v. Nielson*
376 F.3d 1223 (10th Cir. 2004) ......................................................24

*In re TMI Litig.*
193 F.3d 613 (3d Cir. 1999) .........................................................38

*In re TMI*
67 F.3d 1103 (3d Cir. 1995) ......................................................*passim*

*In re TMI Litig. Cases Consol. II*
940 F.2d 832 (3d Cir. 1991) ......................................................*passim*

*WinRed, Inc. v. Ellison*
59 F.4th 934 (8th Cir. 2023)..........................................................20

*Yamaha Motor Corp. v. Calhoun*
516 U.S. 199 (1996) ...................................................................23

*Yang v. Robert Half Int'l, Inc.*
79 F.4th 949 (8th Cir. 2023)..........................................................23

## STATUTES

28 U.S.C. § 1292 ................................................................... 1, 23

28 U.S.C. § 1331 .........................................................................1

28 U.S.C. § 1441 .........................................................................1

42 U.S.C. § 2010 .................................................................... 2, 21

42 U.S.C. § 2012 .................................................................... 9, 20

42 U.S.C. § 2014 ..............................................................*passim*

42 U.S.C. § 2021 .............................................. 10, 20, 24, 26

42 U.S.C. § 2092 ......................................................................9

42 U.S.C. § 2111 ......................................................................9

42 U.S.C. § 2201 ..............................................................13, 25

42 U.S.C. § 2210 ..............................................................*passim*

**RULES**

Fed. R. App. P. 26 .................................................................1

**OTHER AUTHORITIES**

S. Rep. No. 86-870 (1959) ...................................................24

10 C.F.R. § 20.105 (1960)..............................................*passim*

10 C.F.R. § 20.106 (1964)..............................................*passim*

10 C.F.R. § 30.3 (1965) ..................................................14–15

10 C.F.R. § 30.14 (1965) .......................................................15

10 C.F.R. § 30.18 (1970) .......................................................15

10 C.F.R. § 40.2 (1961) .........................................................14

10 C.F.R. § 40.3 (1961) .........................................................14

10 C.F.R. § 40.13 (1961) .......................................................15

22 Fed. Reg. 548 (1957).........................................................30

25 Fed. Reg. 8595 (1960).................................................15, 30

26 Fed. Reg. 2537 (1961) ......................................................24

# JURISDICTIONAL STATEMENT

The district court had jurisdiction over this action by operation of the Price-Anderson Act under 42 U.S.C. § 2014(hh), 28 U.S.C. § 1331, and 28 U.S.C. § 1441. The district court issued its order certifying this interlocutory appeal on November 1, 2023. Appellants timely filed a petition for permission to appeal on November 13, 2023. *See* 28 U.S.C. § 1292(b); Fed. R. App. P. 26(1)(C). This Court granted Appellants' petition on December 19, 2023. This Court has jurisdiction under 28 U.S.C. § 1292(b).

# STATEMENT OF ISSUES

**Issue:**

     1.     Whether federal dosage regulations should be exclusively utilized as the standard of care in a Price-Anderson Act public liability action (42 U.S.C. § 2010, *et seq.*)?

**Apposite cases:**

     1.     *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190 (1983);

     2.     *N. States Power Co. v. Minn.*, 447 F.2d 1143 (8th Cir. 1971), *aff'd sub nom. Minn. v. N. States Power Co.*, 405 U.S. 1035 (1972);

     3.     *In re TMI*, 67 F.3d 1103 (3d Cir. 1995); and

     4.     *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090 (7th Cir. 1994).

**Apposite statutory provisions:**

     1.     42 U.S.C. § 2210; and

     2.     42 U.S.C. § 2014.

<h1 style="text-align:center">STATEMENT OF THE CASE</h1>

**I.  Facts**

**A.  The Manhattan Project and the St. Louis Sites**

During World War II, the government began importing and processing uranium for the Manhattan Project in downtown St. Louis, Missouri.  App. 135; R. Doc. 44, at 10.  Mallinckrodt LLC ("Mallinckrodt") processed and handled the uranium and related radioactive materials under a government contract.  App. 132; R. Doc. 44, at 7.

From the mid-1940s through the 1960s, Mallinckrodt and the government moved the radioactive materials from downtown St. Louis and stored them at a site near Lambert International Airport called the St. Louis Airport Site.  App. 135; R. Doc. 44, at 10.  In the 1960s, some of the remaining radioactive materials from Mallinckrodt's processing were then moved to a storage site in Hazelwood, Missouri, known as "Latty Avenue."  App. 136; R. Doc. 44, at 11.

In the late 1960s, the government offered for sale the radioactive materials at Latty Avenue.  App. 136; R. Doc. 44, at 11.

**B.  Cotter**

Plaintiffs allege that, "[i]n 1969, Cotter purchased and assumed responsibility for the RWM [radioactive waste materials] stockpiled at Latty Avenue" under a source material license issued by the controlling federal agency at the time, the Atomic Energy Commission ("AEC").  App. 136; R. Doc. 44, at 11.  Cotter employed B&K

Construction Company to dry, load, and transport the materials from the Latty Avenue site. App. 137; R. Doc. 44, at 12.

Plaintiffs do not allege that the AEC, its successor the Nuclear Regulatory Commission ("NRC"), or anyone else ever cited Cotter for violating the federal regulations that explicitly defined the permissible levels of radiation that protected members of the public from excessive exposure at the time. *See* 10 C.F.R. § 20.105(a) (1960); 10 C.F.R. § 20.106 (1964).[1]

Plaintiffs further allege that Cotter's involvement with the materials at Latty Avenue ended in 1973, when 10,000 tons of radioactive materials were allegedly shipped to Colorado and the remaining 8,700 tons of material were allegedly mixed "with contaminated soil and dumped . . . in the West Lake Landfill." App. 138; R. Doc. 44, at 13. Cotter applied to terminate its source material license with the AEC on May 10, 1974. App. 139; R. Doc. 44, at 14. Plaintiffs allege that, as part of its application, Cotter certified that the Latty Avenue site was decontaminated to

---

[1] Section 20.105, titled "Permissible levels of radiation in unrestricted areas," provided that the AEC would approve limits on levels of radiation in "unrestricted areas"—where the general public could be exposed—so long as those limits "are not likely to cause any individual to receive a dose to the whole body in any period of one calendar year in excess of 0.5 rem." 10 C.F.R. § 20.105(a) (1960). Section 20.106, titled "Radioactivity in effluents to unrestricted areas," provided that "(a) A licensee shall not possess, use, or transfer licensed material so as to release to an unrestricted area radioactive material in concentrations which exceed the limits specified in Appendix 'B', Table II of this part, . . . For purposes of this section concentrations may be averaged over a period not greater than one year." 10 C.F.R. § 20.106 (1964). The standards of Section 20.105(a) and 20.106(a) remained the same during the alleged conduct here, and through 1981.

permissible levels. *Id.* After inspecting the Latty Avenue site, the AEC terminated

Cotter's source material license on November 13, 1974. App. 139; R. Doc. 44, at

14.

### C. ComEd

Commonwealth Edison Company ("ComEd") is an Illinois public utility

company and the former parent company of Cotter. ComEd purchased Cotter's

stock in 1974, *after* Cotter's alleged involvement with the material at issue ended at the

Latty Avenue site. App. 138; R. Doc. 44, at 13. Plaintiffs do not allege that ComEd

ever owned or possessed the materials at issue.

### D. St. Louis Airport Authority

The St. Louis Airport Authority ("Airport"), a department of the City of St.

Louis, allegedly purchased the St. Louis Airport Site in 1973 by quitclaim deed and

still owns the site today. App. 135; R. Doc. 44, at 10. Plaintiffs allege that the

Airport, as an alleged owner of contaminated land, did nothing to "prevent continued

dispersal and runoff of hazardous, toxic, carcinogenic, radioactive wastes into

Coldwater Creek." App. 135–36; R. Doc. 44, at 10–11. Plaintiffs do not allege that

the Airport ever owned or possessed the materials at issue.

## II. Procedural History

### A. The Removal

Plaintiffs filed this lawsuit on January 25, 2022. App. 11; R. Doc. 1-1, at 1.

Cotter timely removed the case to the district court under the PAA in light of this

Court's recent ruling in *In re Cotter Corporation (N.S.L.)*, 22 F.4th 788 (2022). App. 1; R. Doc. 1, at 1. The case was stayed while the plaintiffs involved in *In re Cotter* sought—and were denied—Supreme Court review. App. 120; R. Doc. 27, at 1; *Banks v. Cotter Corp.*, 143 S. Ct. 422 (2022) (denying certiorari).

## B. The Operative Complaint

On February 7, 2023, after the agreed stay was lifted, Plaintiffs filed their First Amended and Supplemental Complaint ("Complaint"). App. 126; R. Doc. 44, at 1. Plaintiffs allege they are sisters who were exposed to the Manhattan Project radioactive materials while living and working near Coldwater Creek. App. 128–29; R. Doc. 44, at 3–4. Plaintiffs allegedly developed multiple myeloma from their claimed exposure. App. 128–29; R. Doc. 44, at 3–4.

The Complaint contains a single count for a "public liability action" under the PAA. App. 143; R. Doc. 44, at 18. That count includes several purported state law "subparts," including negligence, negligence per se, strict liability, punitive damages, and civil conspiracy. App. 145–51; R. Doc. 44, at 20–26. Each purported "subpart" includes at least one state law standard of care that differs from the federal standards. App. 145–49; R. Doc. 44, at 20–24. Some, like Plaintiffs' negligence "subpart," contain several state law standards. App. 145–46; R. Doc. 44, at 20–21. Other "subparts" contain no standard at all. App. 150; R. Doc. 44, at 25. Cotter, ComEd, and the Airport moved to dismiss for failure to state a claim based on federal

preemption under the PAA and Plaintiffs' failure to plead any violation of the applicable federal standards. Add. 7; App. 365; R. Doc. 85, at 1.

### C. The District Court's Dismissal Order

On September 8, 2023, the district court denied the motions to dismiss. Add. 7–28; App. 365–86; R. Doc. 85, at 1–22. The district court reasoned that Section 2014(hh) of the PAA necessarily required the application of state law unless that law was inconsistent with a specific provision of Section 2210, and therefore whether federal or state law supplies the standard of care in a PAA public liability action should be determined case-by-case (and defendant-by-defendant), rather than as a matter of law. Add. 7–9; App. 365–67; R. Doc. 85, at 1–3.

### D. The District Court's Order Certifying Interlocutory Appeal

The district court amended the September 8, 2023, dismissal order to certify an interlocutory appeal on November 1, 2023. Add. 1–6; App. 432–37; R. Doc. 109, at 1–6. In its certifying order, the district court noted that courts within the Eastern District of Missouri have concluded that federal dosage regulations supply the sole standard of care in PAA public liability actions. Add. 4; App. 435; R. Doc. 109, at 4. The district court further recognized that every circuit court to consider the question has also held that federal dosage regulations provide the standard of care in PAA actions. *Id.*

The district court concluded that "resolution of the standard of care, and the potential imposition of Defendants' proposed standard, [which] would lead to the

dismissal of the action," was a controlling question of law.  Add. 3; App. 434; R. Doc. 109, at 3.  The district court thus certified for immediate appeal the question of "[w]hether federal dosage regulations should be exclusively utilized as the standard of care in a Price-Anderson Act public liability action."  Add. 6; App. 437; R. Doc. 109, at 6.

### E.     The Petition for Permission to Appeal

On November 14, 2023, Cotter, ComEd, and the Airport timely filed their Petition for Permission to Appeal in this Court.  On December 19, 2023, this Court granted the petition.

## III.   Regulatory Background

### A.     The Atomic Energy Act and the Price-Anderson Act

In 1946, the Atomic Energy Act created a federal monopoly over "the production and use of fissionable material"—that is, nuclear material that can undergo "fission," or the splitting of atoms to release energy.  *N. States Power*, 447 F.2d at 1147; *Pac. Gas*, 461 U.S. at 208.  To administer this monopoly, Congress created the AEC and vested it with exceptionally broad regulatory authority.[2]

By 1954, technological advances—and the nuclear arms race during the early Cold War—prompted Congress to permit private actors to join the atomic energy industry.  *See Pac. Gas*, 461 U.S. at 207; *N. States Power*, 447 F.2d at 1148.  Congress

---

[2] This authority is now divided between the NRC and the Department of Energy ("DOE").

concluded that "the national interest would be best served if the Government encouraged the private sector to become involved in the development of atomic energy for peaceful purposes under a program of federal regulation and licensing." *Pac. Gas*, 461 U.S. at 207. Congress ensured continued federal preemption of nuclear safety standards by vesting the AEC with "exclusive jurisdiction to license the transfer, delivery, receipt, acquisition, possession and use of nuclear materials." *Id.*

Specifically, the AEC controlled three categories of nuclear material: source, byproduct, and special nuclear material. *See N. States Power*, 447 F.2d at 1148; 42 U.S.C. § 2012(d). Two are relevant here: source material and byproduct material. *See* 42 U.S.C. § 2092 ("Unless authorized by a general or specific license issued by the Commission, which the Commission is authorized to issue, no person may . . . transfer, deliver, receive possession of or title to . . . any source material after removal from its place of deposit in nature"); 42 U.S.C. § 2111 ("No person may . . . acquire, own, [or] possess . . . any byproduct material, except to the extent authorized by this section, section 82 or section 84."). Congress established this federal system "to provide for the common defense and security and to protect the health and safety of the public." *N. States Power*, 447 F.2d at 1148; 42 U.S.C. § 2012(d). "Upon these subjects, no role was left for the states." *Pac. Gas*, 461 U.S. at 207.

Private participants were still reluctant to enter the nuclear field because of the potential risk of "vast liability" arising from a nuclear incident. *Duke Power Co. v. Carolina Envt'l Study Grp., Inc.*, 438 U.S. 59, 64 (1978). To answer that concern, in 1957

Congress amended the Atomic Energy Act by passing the Price-Anderson Act ("PAA"). The PAA has the dual purposes of "'protect[ing] the public and . . . encourag[ing] the development of the atomic energy industry.'" *Id.* at 64 (quoting 42 U.S.C. § 2012(i)). To achieve these ends, the PAA created an exclusive public liability action for citizens claiming injury from any of the three categories of federally regulated nuclear materials and "provided a 'system of private insurance, Government indemnification, and limited liability for claims' for federal nuclear licensees." *In re Cotter*, 22 F.4th at 794 (citation omitted).

Congress amended the Atomic Energy Act again in 1959 to provide a narrow avenue by which the federal government could cede certain regulatory authority to the states. *N. States Power*, 447 F.2d at 1148 (citing 42 U.S.C. § 2021). In particular, 42 U.S.C. § 2021 authorized the AEC to discontinue some of its regulatory authority over source, special nuclear, and byproduct material—in quantities not sufficient to form a "critical mass," 42 U.S.C. § 2021—in favor of state regulation, but only "when the Governor of a state and the AEC enter into an agreement to that effect." *N. States Power*, 447 F.2d at 1148. Without an agreement between a state and the AEC, "the [AEC] has exclusive authority to regulate for protection against radiation hazards." *Id.* at 1152. It is undisputed that Missouri has no such agreement. *See*

U.S.N.R.C., Missouri: Non-Agreement State Information, www.nrc.gov/agreement-states/missouri.html (last accessed Feb. 28, 2024).

Between 1957 and 1988, the Supreme Court repeatedly affirmed that "the safety of nuclear technology [is] the exclusive business of the federal government." *Pac. Gas*, 461 U.S. at 208; *Duke Power*, 438 U.S. at 64; *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 250 (1984). Against this backdrop, Congress passed the Price-Anderson Amendments Act in 1988. The 1988 Amendments Act established federal subject matter jurisdiction over the entirety of any public liability action and channeled all legal liability to the federal government. *El Paso Nat. Gas Co. v. Neztsosie*, 526 U.S. 473, 477 (1999); *see also In re Cotter*, 22 F.4th at 795. Through the 1988 Amendments Act, Congress "ensured that all claims resulting from a given nuclear incident would be governed by the same law, provided for the coordination of all phases of litigation and the orderly distribution of funds, and assured the preservation of sufficient funds for victims whose injuries may not become manifest until long after the incident." *In re TMI Litig. Cases Consol. II*, 940 F.2d 832, 857 (3d Cir. 1991) ("*TMI I*").

As the Supreme Court has explained, the preemptive force of the PAA's structure, including the 1988 Amendments Act, which provides original federal jurisdiction and the right to removal to federal court, is so "extraordinary" that it resembles complete preemption and "converts an ordinary state common-law complaint into one stating *a federal claim*." *Neztsosie*, 526 U.S. at 484 n.6 (emphasis added). Under its "unusual preemption provision," *id.* at 484 (citing 42 U.S.C.

§ 2014(hh)), the PAA converts all claims meeting its criteria into "a 'public liability action' and therefore the entire suit is deemed to be an action arising under federal law." *Cotroneo v. Shaw Env't & Infrastructure, Inc.*, 639 F.3d 186, 194 (5th Cir. 2011) (citing 42 U.S.C. § 2014(hh)); *see also Halbrook*, 888 F.3d at 974 ("Congress created a federal cause of action for public-liability claims concerning nuclear incidents"); *In re Cotter*, 22 F.4th at 793 (same); *O'Conner*, 13 F.3d at 1099–1100 ("a state cause of action is not merely transferred to federal court; instead, a new federal cause of action supplants the prior state cause of action").

As a result of the 1988 Amendments Act, the PAA creates an exclusive federal cause of action for any "public liability action" arising from any "nuclear incident." *In re Cotter*, 22 F.4th at 793; *see* 42 U.S.C. §§ 2014(hh), 2210(n)(2); *Neztsosie*, 526 U.S. at 477. Congress broadly defined "nuclear incident" as "any occurrence, including an extraordinary nuclear occurrence, . . . causing . . . bodily injury, sickness, disease, or death . . . arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material." 42 U.S.C. § 2014(q). The PAA defines a "public liability action" as "any suit asserting any public liability," 42 U.S.C. § 2014(hh), and "[p]ublic liability" as "any legal liability arising out of or resulting from a nuclear incident," 42 U.S.C. § 2014(w).

In creating this single PAA claim, Congress ensured that all claims regarding the same nuclear incident would be governed by the same law. *Matthews v. Centrus Energy Corp.*, 15 F.4th 714, 721 (6th Cir. 2021); *TMI I*, 940 F.2d at 856–57. This Court

has therefore held that any lawsuit alleging a "nuclear incident" must state a claim under the PAA. *See Halbrook*, 888 F.3d at 977 n.3 ("claims under the Act are claims under federal rather than state law"); *In re Cotter*, 22 F.4th at 793 ("Congress created a federal cause of action for public-liability claims concerning nuclear incidents" (citing *Halbrook*, 888 F.3d at 974)). Indeed, "for claims arising from a nuclear incident, a plaintiff 'can sue under the [PAA], as amended, or not at all.'" *Matthews*, 15 F.4th at 721 (collecting decisions from the Second, Third, Fifth, Sixth, Seventh, Ninth, and Eleventh Circuits reaching same conclusion).

## B.     The Federal Regulations

Beginning in 1947, the AEC (and, from 1975, the NRC and DOE) has implemented the objectives of the Atomic Energy Act under the broad authority to "establish by rule, regulation, or order, such standards and instructions to govern the possession and use of special nuclear material, source material, and byproduct material as the Commission may deem necessary or desirable to promote the common defense and security or to protect health or to minimize danger to life or property." 42 U.S.C. § 2201(b). In other words, the AEC has responsibility "to resolve the proper balance between desired industrial progress and adequate health and safety standards." *N. States Power*, 447 F.2d at 1153–54.

By 1971, it was well-established by this Court that "[t]he federal licensing scheme to control the development and utilization of atomic energy, as established by Congress and implemented by the AEC, is extraordinarily pervasive, probably more

pervasive than any regulatory scheme considered by the Supreme Court in analogous (pre-emption) cases." *N. States Power*, 447 F.2d at 1153. That regime of "pervasive federal regulation" occupies "the entire field of nuclear safety concerns." *TMI I*, 940 F.2d at 858; *Roberts v. Florida Power & Light Co.*, 146 F.3d 1305, 1308 (11th Cir. 1998) ("'state regulation of nuclear safety, through either legislation or negligence actions, is preempted by federal law'" (quoting *O'Conner*, 13 F.3d at 1105)). As this Court has held, it is "[o]nly through the application and enforcement of uniform standards promulgated by a national agency [that] these dual objectives [will] be assured." *N. States Power*, 447 F.2d at 1154; *see also TMI I*, 940 F.2d at 859 ("any state duty would infringe upon pervasive federal regulation in the field of nuclear safety, and thus conflict with federal law"); *O'Conner*, 13 F.3d at 1105 (same).

The AEC exercised its regulatory authority, as relevant here, in two ways. First, the AEC prohibited possession or use of regulated source or byproduct material without a federal license. 10 C.F.R. § 40.3 (1961) ("A person subject to the regulations in this part [*i.e.*, all persons in the United States, 10 C.F.R. § 40.2 (1961)] may not receive title to, own, receive, possess, use, transfer, provide for long-term care, deliver or dispose of byproduct material . . . or any source material after removal from its place of deposit in nature, unless authorized in a specific or general license issued by the Commission under the regulations in this part."); 10 C.F.R. § 30.3 (1965) ("no person shall manufacture, produce, transfer, receive, acquire, own, possess, use,

import or export byproduct material except as authorized in a specific or general

license issued pursuant to the regulations in this chapter.").[3]

Second, the AEC developed federal regulations to establish standards for the

protection of licensees, their employees, and *"the general public* against radiation

hazards." *In re TMI*, 67 F.3d 1103, 1110 (3d Cir. 1995), *cert. denied*, 516 U.S. 1154

(1996) ("*TMI II*") (emphasis added) (quoting 25 Fed. Reg. 8595, 8595 (1960)). These

federal regulations, which the AEC and NRC have amended multiple times, are

"based upon extensive scientific and technical investigation," *id.*, and "represent the

considered judgment of the relevant regulatory bodies—the Federal Radiation

Council, EPA, AEC, and NRC—on the appropriate levels of radiation to which the

general public may be exposed," *id.* at 1113–14.

The AEC's radiation safety standards include: (1) permissible levels of radiation

in "unrestricted areas"—where the general public could be exposed—of a whole body

dose limit set by the AEC, which was 0.5 rem, or 500 mrem, for the time period in

question, 10. C.F.R. § 20.105(a) (1960); and (2) limits on releases into unrestricted

areas for specific radionuclides, using a one-year average, 10 C.F.R. § 20.106(a) (1964).

---

[3] These regulations are subject to certain exemptions, none of which is relevant to
Plaintiffs' PAA claim. *See, e.g.*, 10 C.F.R. § 40.13 (1961) (unimportant quantities of
source material); 10 C.F.R. § 30.14 (1965) (exempt concentrations of byproduct
material); 10 C.F.R. § 30.18 (1970) (exempt quantities of byproduct material).

## IV. Related Litigation

### A. *McClurg*

Beginning in 2012, more than five hundred plaintiffs sued Mallinckrodt, Cotter, and others in individual lawsuits under the PAA and Missouri state law in the Eastern District of Missouri, alleging personal injury or wrongful death from exposure to the same Manhattan Project radioactive materials as here. *McClurg v. Mallinckrodt, Inc.*, No. 4:12-CV-00361-AGF, 2015 WL 867455, at *2 (E.D. Mo. Feb. 27, 2015), *on reconsideration*, No. 4:12-CV-00361-AGF, 2016 WL 6432776 (E.D. Mo. Oct. 31, 2016), *aff'd Halbrook*, 888 F.3d at 971.

In 2013, the district court confirmed its original jurisdiction under the PAA. Following the Fifth and Sixth Circuits, the court dismissed all state-law claims with prejudice and granted leave to replead the cause of action under the PAA because "a plaintiff who asserts any claim arising out of a 'nuclear incident' as defined in the [PAA] . . . can sue under the PAA or not at all." *McClurg v. MI Holdings, Inc.*, 933 F. Supp. 2d 1179, 1186 (E.D. Mo. 2013) (quoting *Cotroneo*, 639 F.3d at 193). Accordingly, in 2015, the district court held that the standard of care is defined by applicable federal regulations. *McClurg*, 2015 WL 867455, at *2. In 2016, the district court dismissed certain plaintiffs' claims with prejudice based on the applicable state statute of limitations. *McClurg*, 2016 WL 6432776, at *5.

On appeal, this Court affirmed the district court's dismissal of plaintiffs' PAA claims, upholding (1) application of the PAA to the same alleged "nuclear incident" at

issue here, (2) the court's original jurisdiction because the PAA "expressly invoked federal-question jurisdiction in the Article III courts," and (3) application of state statutes of limitation because they are not inconsistent with the PAA for "regular," non-extraordinary nuclear occurrences. *Halbrook*, 888 F.3d at 971, 977.

Later, four additional plaintiffs asserted a PAA public liability action based on the same alleged conduct as the rest of the *McClurg* plaintiffs. *Butler v. Mallinckrodt LLC*, No. 4:18-cv-01701-AGF, 2022 WL 4598531, at *1 (E.D. Mo. Sept. 30, 2022). The district court granted summary judgment for the defendants based in part on the plaintiffs' failure to present reliable evidence that the defendants breached the federal standard of care. *Id.* at *4–5, 12; *Butler v. Mallinckrodt LLC*, No. 4:18-CV-01701-AGF, 2022 WL 970876, at *12, 17 (E.D. Mo. Mar. 31, 2022).

## B. *Banks*

In 2018, Tamia Banks, along with several other plaintiffs represented by Plaintiffs' counsel here, filed suit in Missouri state court, alleging individual and putative class claims against the Appellants for allegedly contaminating their property with the same radioactive materials as here. *In re Cotter*, 22 F.4th at 790. Cotter removed the suit ("*Banks*") to federal court under the PAA. *Id.* at 791. The district court concluded that Cotter did not have a relevant license or indemnity agreement under the PAA, ruled therefore that the PAA did not apply, and twice remanded the case to state court. *Id.*

On appeal, this Court concluded that the district court "made an erroneous legal determination that constitutes an abuse of discretion" when "it determined that the PAA does not apply to Plaintiffs' claims against Cotter because Cotter lacked an applicable license or indemnity agreement." *Id.* at 793. Relying on the broad language and purposes of the PAA, this Court held that the "PAA provides original federal question jurisdiction for all nuclear incidents regardless of whether the defendant had an applicable indemnity agreement." *Id.* at 796. The Supreme Court declined to review this Court's decision. *Banks*, 143 S. Ct. at 422 (denying certiorari). Currently, the district court in *Banks* is considering several motions to dismiss, which also raise the issue of the proper standard of care in a PAA public liability action. *Banks v. Cotter Corp.*, No. 20-cv-01227, ECF Nos. 155, 157, 159, 161 (E.D. Mo. Aug. 8, 2023).

### C.    *Kitchin*

Also in 2018, the same Plaintiffs' lawyers as here filed a second putative class action allegedly arising out of some of the same radioactive materials. *See Kitchin v. Bridgeton Landfill LLC*, No. 18-cv-00672, ECF No. 1-1 (E.D. Mo. Apr. 27, 2018). The *Kitchin* plaintiffs asserted that the "defendants caused [] radioactive contamination through their improper generation, handling, storage, and disposal of radioactive materials," but expressly disclaimed reliance on the PAA. *Kitchin v. Bridgeton Landfill, LLC*, No. 18-cv-00672, 2024 WL 379285, at *1 (E.D. Mo. Feb. 1, 2024). The plaintiffs brought state law claims against defendants, including trespass, nuisance, negligence, negligence per se, and strict liability. *Id.*

Cotter and the other defendants moved to dismiss for failure to state a claim in light of PAA preemption and the plaintiffs' express disavowal of the PAA.  *Id.*  The district court granted the defendants' motions, concluding that the PAA "preempts state-law claims given that it 'leaves no room for state-law causes of action arising from a nuclear incident.'"  *Id.* at *8–10, 12 (quoting *Matthews*, 15 F.4th at 721).  After dismissal, plaintiffs have moved to file an amended complaint asserting a PAA claim.  *Kitchin v. Bridgeton Landfill LLC*, No. 18-cv-00672, ECF No. 199 (E.D. Mo. Feb. 26, 2024).  The district court is considering the motion, which re-raises the issue of the proper standard of care.

# SUMMARY OF THE ARGUMENT

In a PAA public liability action, federal radiation dosage regulations provide the standard of care because state standards would invade the federal government's exclusive regulation of nuclear safety and defeat the dual purposes of the PAA to protect the public and encourage private nuclear energy development.

For more than forty years, the Supreme Court has upheld federal preemption of state nuclear safety standards. *Pac. Gas*, 461 U.S. at 212 (federal preemption in this area is "not particularly controversial"); *Duke Power*, 438 U.S. at 64; *Silkwood*, 464 U.S. at 250. Under ordinary field preemption principles, federal law thus occupies the field of nuclear safety so comprehensively that it leaves no room for state regulation. *See WinRed, Inc. v. Ellison*, 59 F.4th 934, 945 (8th Cir. 2023). Indeed, this Court has underscored the need for federal preemption in the field of nuclear safety because it is "[o]nly through the application and enforcement of uniform standards promulgated by a national agency" that the objectives of the Atomic Energy Act and PAA will be achieved. *N. States Power*, 447 F.2d at 1153–54; 42 U.S.C. § 2012(i).

As Congress has ultimately made clear, while the Atomic Energy Act permits some state regulation of certain aspects of the broader nuclear energy industry, state regulation of nuclear materials must be "for purposes *other than* protection against radiation hazards"—i.e., outside the specific field of nuclear safety. 42 U.S.C. § 2021(k) (emphasis added).

Against this backdrop of field preemption, Congress amended the PAA in 1988 to add 42 U.S.C. §§ 2014 and 2210, which not only give federal district courts original jurisdiction over public liability actions arising out of or resulting from a nuclear incident, but also provide for removal to federal court as of right, converting state-law claims into a claim arising under federal law. *See* 42 U.S.C. §§ 2010, 2014. Section 2014(hh) provides:

> The term "public liability action", as used in section 2210 of this title, means any suit asserting public liability. A public liability action shall be deemed to be an action *arising under section 2210* of this title, and the substantive rules for decision in such action shall be *derived from* the law of the State in which the nuclear incident involved occurs, *unless such law is inconsistent with the provisions of such section.*

42 U.S.C. § 2014(hh) (emphasis added); *Neztsosie*, 526 U.S. at 484 n.6.

Every Circuit to have addressed this preemption provision, including this Circuit, has agreed that it means that the PAA "incorporate[s] state law only to the extent consistent with the Act," and federal claims therefore supplant any state law causes of action. *Halbrook*, 888 F.3d at 977. That is, state law may work within a PAA claim, such as providing a statute of limitation, but ultimately federal law "mold[s] and shape[s]" the claim's elements, including the standard of care. *See O'Conner*, 13 F.3d at 1100.

The district court's interpretation of the PAA errs as a matter of law in two ways. *First*, the district court interpreted Section 2014(hh) to only preempt state law that is inconsistent with a *specific provision* of Section 2210. This overly literal

interpretation divorces Section 2014(hh) from its context within the PAA and Atomic Energy Act and is contrary to every Circuit decision to interpret it. *Second*, even under the district court's erroneous interpretation, ordinary preemption principles still operate. *See Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 869–74 (2000).

There can be no reasonable dispute that regulating nuclear safety is the exclusive province of the federal government. Nor can there be any dispute that state tort standards purport to regulate nuclear safety. Plaintiffs' suit highlights this reality: in seeking to impose a hodgepodge of standards, they claim a need to "prevent significant bodily injury, sickness and disease" and "to protect the health and safety of the public" from exposure to radioactive materials. *See, e.g.*, App. 145, 147; R. Doc. 44, at 20, 22. Because the state standards of care that Plaintiffs assert in this PAA public liability action fall within the field of nuclear safety, the federal regulations must preempt them as a matter of law.

To state a PAA claim, Plaintiffs must therefore allege facts that, if true, show a breach of the federal regulations. They do not. The district court acknowledged this failure, finding that "resolution of the standard of care, and the potential imposition of [Appellants'] proposed standard, would lead to the dismissal of the action." Add. 3; App. 434; R. Doc. 109, at 3. Accordingly, because federal dosage regulations set the exclusive standard of care in a PAA public liability action, and because Plaintiffs have not adequately pled their breach, the district court's order denying Appellants'

motions to dismiss should be reversed with instructions to dismiss Plaintiffs'

Complaint.

## ARGUMENT

### I. The Standard of Review Is *De Novo.*

This Court reviews the appropriate standard of care *de novo. See, e.g., Aragon v. Wal-Mart Stores*, 735 F.3d 807, 809 (8th Cir. 2013) (whether a defendant owes a plaintiff a duty of care is a question of law); *Noe v. Henderson*, 456 F.3d 868, 870 (8th Cir. 2006) (federal preemption of state law is a question of law reviewed *de novo*); *Yang v. Robert Half Int'l, Inc.*, 79 F.4th 949, 961–62 (8th Cir. 2023) (appellate court reviews district court's order on a motion to dismiss *de novo*).

The scope of this Court's review also extends beyond the certified question to the whole order below, if necessary. *See Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199, 205 (1996). Under Section 1292(b), "it is the *order* that is appealable, and not the controlling question identified by the district court." *Id.* Thus, while the Court "may not reach beyond the certified order to address other orders made in the case," the Court "may address any issue fairly included within the certified order." *Id.*

### II. Federal Safety Regulations Create the Exclusive Standard of Care in a Price-Anderson Act Public Liability Action.

In a PAA public liability action, federal nuclear safety regulations create the standard of care because the PAA is part of a comprehensive federal regime that preempts the states from regulating "nuclear safety concerns, except the limited

powers expressly ceded to the states." *Pac. Gas*, 461 U.S. at 212.  Under this federal

regime, "the states possess no authority to regulate radiation hazards unless pursuant

to the execution of an agreement surrendering federal control over the three

categories authorized under § 2021(b)" of source, byproduct, and special nuclear

material.  *N. States Power*, 447 F.2d at 1149–50; *see also Skull Valley Band of Goshute*

*Indians v. Nielson*, 376 F.3d 1223, 1240–45 (10th Cir. 2004) (surveying history of

pervasive federal regulation of nuclear energy).

Because Missouri has no agreement with the federal government in which the

federal government surrenders regulatory control over those three categories of

radioactive materials, Missouri law cannot regulate radiation safety or the possession

and use of those materials, through common law claims, statutory tort standards, or

otherwise.  *N. States Power*, 447 F.2d at 1147; *Pac. Gas*, 461 U.S. at 206; U.S.N.R.C.,

Missouri: Non-Agreement State Information, www.nrc.gov/agreement-

states/missouri.html (last accessed Feb. 28, 2024).[4]

---

[4] Even in states where an agreement exists, any state program must be "coordinated
and compatible" with AEC/NRC regulations.  42 U.S.C. § 2021(g); *Pac. Gas*, 461 U.S.
at 209.  *See also* S. Rep. No. 86-870, at 2882 (1959) (Joint Committee Report noting
that "it is intended that State and local standards should be the same as Federal
Standards in order to avoid conflict, duplication, or gaps.").  The AEC carried out
Congress's intention by ruling that "[t]here *shall be uniformity* on maximum permissible
doses and levels of radiation and concentrations of radioactivity, as fixed by Part 20 of
the AEC regulations based on officially approved radiation protection guides."  26
Fed. Reg. 2537 (Mar. 24, 1961) (emphasis added).

**A.     Congress created the PAA public liability action within a comprehensive, preemptive regulatory structure.**

Like the broader Atomic Energy Act, the PAA centers on three categories of highly regulated nuclear materials: source material, byproduct material, and special nuclear material. *See* 42 U.S.C. § 2201; 42 U.S.C. § 2014(q). As explained above, the pervasive "[f]ederal regulatory scheme which Congress directed and which the AEC [now NRC] has carried into effect through the promulgation and enforcement of detailed regulations" governs the possession and use of those three categories of nuclear materials. *N. States Power*, 447 F.2d at 1153.

Although state law may inform certain aspects of a PAA public liability action, 42 U.S.C. § 2014(hh), such as providing the statutes of limitation, federal law governs radiation safety standards. *See Pac. Gas*, 461 U.S. at 208 ("the safety of nuclear technology was the exclusive business of the federal government"). As this Court has found, "a dual system of licensing and regulation with control exerted by both the states and the federal government over the level of radioactive effluents discharged from nuclear power plants would create 'an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *N. States Power*, 447 F.2d at 1154 (citing *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

The fact that Congress allows some state regulation of nuclear materials but specifies that it must be "'for purposes *other than* protection against radiation hazards' underscore[s] the distinction . . . between the spheres of activity left respectively to the

federal government and the states." *Pac. Gas*, 461 U.S. at 210 (quoting 42 U.S.C. § 2021(k)). Throughout the history of the Atomic Energy Act and the PAA, Congress has preserved the federal government's role in "maintain[ing] complete control of the safety and 'nuclear' aspects of energy generation." *Id.* at 211–12.

The rationale is simple. If the states were allowed to "impose stricter standards" than federal regulation, such as the amalgam of Missouri standards Plaintiffs seek to apply here, "they might conceivably be so overprotective in the area of health and safety as to unnecessarily stultify the industrial development and use of atomic energy for the production of electric power." *N. States Power*, 447 F.2d at 1154; *see also In re Cotter*, 22 F.4th at 794 ("Congress enacted the PAA in 1957 to encourage private commercial nuclear research and energy production after it became clear that, without government intervention, the liability risks from nuclear material would stunt private development."). State regulation of these types of nuclear materials "for safety reasons would also be in the teeth of the Atomic Energy Act's objective to insure that nuclear technology be safe enough for widespread development and use—and would be preempted for that reason." *Pac. Gas*, 461 U.S. at 213; *see, e.g.*, App. 145–49; R. Doc. 44, at 20–24 (Complaint's numerous and diverse standards of care).

Field preemption of nuclear safety rules is not limited to state regulatory actions, but also extends to state tort law. That is because states will be de facto regulating nuclear materials if they are allowed to set the standard of care in court.

And federal preemption of state standards of care avoids "put[ting] juries in charge of deciding the permissible levels of radiation exposure . . . [which] would undermine the purpose of a comprehensive and exclusive federal scheme for nuclear incident liability." *In re Hanford Nuclear Reserv. Litig.*, 534 F.3d 986, 1003 (9th Cir. 2008) (quotations omitted).

In fact, Congress swiftly overruled the Supreme Court when it permitted the balance of regulatory authority under the PAA to tip toward permitting state tort remedies. In *Silkwood*, the Supreme Court momentarily departed from its precedent on field preemption of nuclear safety standards and, finding both the statute and legislative history silent, concluded that the PAA did not preempt state law on punitive damages. 464 U.S. at 255, 257. The Court acknowledged "the NRC's exclusive authority to set safety standards," but found it "did not foreclose the use of state tort remedies." *Id.* at 253. Congress rejected *Silkwood*'s rationale in the 1988 Amendments Act to the PAA and barred punitive damages. *See* 42 U.S.C. § 2210(s); *O'Conner*, 13 F.3d at 1105. The 1988 Amendments Act "makes pointedly clear that any tension between federal standards and state liability standards is to be resolved so as to avoid inconsistency with the Price–Anderson Act." *O'Conner*, 13 F.3d at 1105 n.13 (citing 42 U.S.C. § 2014(hh)). In the wake of Congress's response to *Silkwood*, the Supreme Court returned to upholding the "broad scheme of federal regulation and licensing" created by the Atomic Energy Act, with the PAA's now-broadened

original and removal jurisdiction for all nuclear incidents. *Neztsosie*, 526 U.S. at 476–77.

Given this "overwhelming evidence" of federal preemption in the field of nuclear safety, PAA public liability actions must "use the federal regulations as the measure of duty" to ensure that "state regulation of nuclear safety, through either legislation or negligence actions, is preempted by federal law." *O'Conner*, 13 F.3d at 1104–05. As a result, "no liability should attach" to defendants who "are in compliance with those regulations." *Id.* at 1104 (citation omitted).

## B. The PAA's text and framework confirm the preemption of inconsistent state law standards.

The text and framework of the PAA reinforce federal preemption of nuclear safety standards. The PAA's "unusual" provision, 42 U.S.C. § 2014(hh), should be read in conjunction with the field preemption operating throughout the PAA and the larger statutory scheme of the Atomic Energy Act as a whole. *Neztsosie*, 526 U.S. at 484; *see King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (observing "the cardinal rule that the statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context"); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."). Indeed, as it does here, "[t]he existence of a comprehensive remedial scheme can demonstrate an 'overpowering federal policy'

that determines the interpretation of a statutory provision." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 216–17 (2004).

The district court erred by divorcing Section 2014(hh) from its statutory context in concluding that the Atomic Energy Act "preempts substantive state law *only when it is inconsistent with Section 2210*," meaning the "specific text of Section 2210." *See* Add. 18–19; App. 376–77; R. Doc. 85, at 12–13 (emphasis original); *see also King*, 502 U.S. at 221; *Robinson*, 519 U.S. at 341; *Davila*, 542 U.S. at 216–17. This interpretation disregards the established field preemption as applied to nuclear safety standards and eviscerates the purposes of the PAA and Atomic Energy Act.[5] *See Davila*, 542 U.S. at 214–17 ("comprehensive remedial scheme" of federal ERISA statute preempted state remedy not expressly enumerated in ERISA).

Read properly, Section 2014(hh) harmonizes any inconsistencies between state law and specific provisions of Section 2210—such as precluding punitive damages or limiting liability, 42 U.S.C. § 2210(n), (s)—and works in conjunction with the broader field preemption of nuclear safety standards established by the PAA and Atomic Energy Act as a whole. *See Geier*, 529 U.S. at 869–74.

---

[5] The district court also mischaracterized Appellants' position as asserting that "state law is preempted when inconsistent with federal regulations generally." Add. 18–19; App. 376–77; R. Doc. 85, at 12–13. Instead, Appellants' position is that state law is preempted when it invades the field of federal *nuclear safety* regulation.

### C. The federal regulations that set the standard of care for a PAA public liability action uniformly implement the purposes of the Atomic Energy Act and PAA.

As authorized by the Atomic Energy Act, the AEC (now NRC) issued the federal regulations here "to establish standards for the protection of licensees, their employees *and the general public* against radiation hazards." 25 Fed. Reg. 8595, 8595 (1960) (emphasis added). During the conduct alleged here, Section 20.105 *permitted* releases of radiation in "unrestricted areas"—where the general public could be exposed—so long as those releases were "not likely to cause any individual to receive a dose to the whole body in any period of one calendar year in excess of 0.5 rem [or 500 mrem]." 10 C.F.R. § 20.105(a) (1960). Section 20.106 also permitted releases of specific radionuclides in unrestricted areas as long as their concentrations did not exceed specific limits set for each radionuclide using a one-year average. 10 C.F.R. § 20.106 (1964).

In setting those limits, the AEC followed a precautionary standard: "It is believed that the standards incorporated in these regulations provide, in accordance with present knowledge, a very substantial margin of safety for exposed individuals." *See* 22 Fed. Reg. 548, 549 (1957). The federal standards also accounted for input from the Federal Radiation Council and the National Committee on Radiation Protection. *See* 25 Fed. Reg. 8595, 8595 (1960).

In short, the AEC determined that a maximum yearly radiation exposure of 0.5 rem in the general public was "an appropriate regulatory basis for protection of the

health and safety of employees and the public without imposing undue burdens upon licensed users of radioactive material." *Id.* The AEC reiterated that these exposure limits were "based upon extensive scientific and technical investigation and upon years of experience with the practical problems of radiation protection," and that they "provide a conservative standard of safety." *Id.* Indeed, "the use of considerably higher exposure limits in this regulation would not have been considered to result in excessive hazards." *Id.*; *see also TMI II*, 67 F.3d at 1110–11.

As a result, if a state were to impose a lower limit of radiation exposure for the general public, it would not necessarily increase public safety, but it would burden and stunt the nuclear energy industry. *See, e.g., Farina v. Nokia Inc.*, 625 F.3d 97, 123 (3d Cir. 2010) ("When Congress charges an agency with balancing competing objectives, it intends the agency to use its reasoned judgment to weigh the relevant considerations and determine how best to prioritize between these objectives."); *In re Hanford*, 534 F.3d at 1003. Allowing Missouri tort law (and Plaintiffs here) to impose a different standard would contradict the judgment that federal regulators reached. Such a result is anathema to the Atomic Energy Act and PAA.

### D. Deciding the standard of care on a defendant-by-defendant basis destroys the uniformity required to further the purposes of the Atomic Energy Act and PAA.

The district court's erroneous decision to apply different standards of care to different defendants in the same PAA public liability action would further defeat the purpose of uniform regulation in the field of nuclear safety. This defendant-by-

defendant analysis would apply different standards of care to licensees versus non-licensees, to original versus downstream owners of the nuclear materials, to contractors versus subcontractors, and to parent versus subsidiary corporations. Here, for example, Plaintiffs seek to impose one standard of care on Cotter, the alleged licensee of the materials, and a different standard of care on ComEd, Cotter's former parent corporation, in the same PAA public liability action.

Nothing in the Atomic Energy Act's grant of jurisdiction to the AEC limits its authority to regulating solely licensees. And holding that the federal standards cannot regulate the conduct of anyone other than a licensee in a PAA public liability action, no matter how directly a non-licensee's conduct may affect nuclear safety, would negate the broad grants of power to and discretion vested in the AEC and deprive the federal government of the ability to carry out the goals it was directed to accomplish.

As this Court has recognized, field preemption of nuclear safety standards flows from "the nature of the subject matter regulated," which "demands 'exclusive federal regulation in order to achieve uniformity vital to national interests.'" *N. States Power*, 447 F.2d at 1153–54. Congress has made clear in its passage of the Atomic Energy Act, PAA, and numerous amendments broadening the scope and power of the PAA that the very nature of source, byproduct, and special nuclear materials "must be regulated by the United States in the national interest because of their [e]ffect upon interstate and foreign commerce and in order to provide for the common defense and security and to protect the health and safety of the public." *Id.*

at 1153. Uniformity in applying the considered judgment of the AEC—now NRC—to possession and use of these materials is paramount.

This Court has also explicitly rejected a distinction in applying the PAA to licensees but not non-licensees. *See In re Cotter*, 22 F.4th at 795. In doing so, this Court looked to the PAA's history and Congress's purpose of broadening federal jurisdiction under the Act. *Id.* The Court rightly focused on the nature of Plaintiffs' claims as resulting from a nuclear incident, rather than the identity of the defendant. *See id.*; *see also id.* at 794. And the Court should come to the same result here because it is irrelevant whether a defendant in a PAA public liability action is licensed. If the plaintiffs claim, as they do here, that a defendant's liability arises out of source, byproduct, or special nuclear materials—as they must, given the definition of a nuclear incident under the PAA—then the federal nuclear safety standards must provide the standard of care regardless of the defendant's licensure status.

## III. The Circuits—Consistent with this Court's Precedents—Have Uniformly Held that Federal Nuclear Safety Standards Preempt State Standards of Care in a Price-Anderson Act Public Liability Action.

This Court's own precedents bolster the conclusion that federal dosage regulations preempt state standards of care in a PAA suit. As this Court has held, PAA claims "are claims under federal rather than state law," and Congress "incorporated state law only to the extent consistent with the [PAA]." *Halbrook*, 888 F.3d at 977, 977 n.3; *see also In re Cotter*, 22 F.4th at 793–94. These are not merely jurisdictional statements. Instead, the PAA "created substantive federal law governing

nuclear accidents" and it "embodies substantive federal policies." *Halbrook*, 888 F.3d at 977 n.3 (citations omitted). As a result, the "*federal* scheme . . . mold[s] and shape[s] any cause of action grounded in state law." *O'Conner*, 13 F.3d at 1100; *see Halbrook*, 888 F.3d at 977 n.3 (approving *O'Conner's* "convincing[]" analysis).

This Court has also affirmed the broad preemptive effect of the Atomic Energy Act and the critical role exclusive federal regulation of nuclear safety standards plays in furthering the purposes of these statutes. *N. States Power*, 447 F.2d at 1153–54 ("Congress vested the AEC with the authority to resolve the proper balance between desired industrial progress and adequate health and safety standards. Only through the application and enforcement of uniform standards promulgated by a national agency will these dual objectives be assured"). These prior holdings compel the conclusion that state standards of care that purport to regulate nuclear safety must be preempted.

For these same reasons, every Circuit to have interpreted the PAA has concluded that federal nuclear safety regulations preempt state standards of care in a PAA action:

- **Third Circuit:** "After reviewing the regulations, the reasons behind their promulgation, and the relevant case law, we hold that §§ 20.105 and 20.106 constitute the federal standard of care." *TMI II*, 67 F.3d at 1113; *accord TMI I*, 940 F.2d at 859 ("states are preempted from imposing a non-federal duty in tort").

- **Fifth Circuit:** Plaintiffs' "claims under Texas law are inconsistent with the PAA, and they cannot establish public liability, as they must in order to prevail in their public liability action." *Cotroneo*, 639 F.3d at 197.

- **Sixth Circuit:** "[B]ecause we agree with the analyses of preemption in *O'Conner* and [*TMI I*], we hold that the Price–Anderson Act preempts Nieman's state law claims; the state law claims cannot stand as separate causes of action." *Nieman v. NLO, Inc.*, 108 F.3d 1546, 1553 (6th Cir. 1997).

- **Seventh Circuit:** The "federal regulations must provide the sole measure of the defendants' duty in a public liability cause of action." *O'Conner*, 13 F.3d at 1105.

- **Eighth Circuit:** "The Third Circuit and the Seventh Circuit have addressed similar questions and explained *convincingly* why claims under the Act are claims under federal rather than state law." *Halbrook*, 888 F.3d at 977 n.3 (citing *TMI I*, 940 F.2d at 855, and *O'Conner*, 13 F.3d at 1099) (emphasis added).

- **Ninth Circuit:** "Every federal circuit that has considered the appropriate standard of care under the PAA has concluded that nuclear operators are not liable unless they breach federally-imposed dose limits." *In re Hanford*, 534 F.3d at 1003; *accord Golden v. CH2M Hill Hanford Grp., Inc.*, 528 F.3d 681, 683 (9th Cir. 2008) ("the Price-Anderson Act . . . preempts all state-law claims for injury resulting from nuclear incidents").

- **Tenth Circuit:** The "state attempts to regulate in this area are preempted." *Kerr-McGee Corp. v. Farley*, 115 F.3d 1498, 1503 (10th Cir. 1997).

- **Eleventh Circuit:** The "federal safety regulations conclusively establish the duty of care owed in a public liability action." *Roberts*, 146 F.3d at 1308.

The district court here rejected *every* relevant Circuit decision when it erroneously concluded that federal dosage regulations should not be used as the exclusive standard of care in a PAA action. Add. 25; App. 383; R. Doc. 85, at 19. And while the court's order asserts that its unique interpretation aligns with "[s]everal circuit courts," Add. 18; App. 376; R. Doc. 85, at 12 n.22 (citing *Cotroneo*, 639 F.3d at 206 (Dennis, J., concurring in part and dissenting in part); *Matthews*, 15 F.4th at 719;

*Cook v. Rockwell Int'l Corp.*, 618 F.3d 1127, 1144 (10th Cir. 2010)), this assertion is plainly incorrect.

**Cotroneo.** The district court cited *Cotroneo* as part of its suggestion that "[s]everal circuit courts agree with the Court's interpretation." Add. 18; App. 376; R. Doc. 85, at 12 n.22. However, the court cited to the *dissenting* opinion. In *Cotroneo*, the dissent cited Section 2014(hh) in arguing that the "majority opinion does not identify any provision of the PAA, nor any purpose for which the PAA was enacted or amended, that is actually inconsistent with anything in the plaintiffs' 'offensive contact' battery claims derived from Texas law," and suggested that a state law claim must be inconsistent with a specific provision of Section 2210 to be preempted. *Cotroneo*, 639 F.3d at 204. But the majority opinion rejected the dissent's analysis because it found that interpreting Section 2014(hh) in such a way would undermine "the 'complex federal scheme' Congress has created to govern public liability actions under the PAA," which "is clearly inconsistent with section 2210." *Id.* at 195–97 (adopting *O'Conner*, 13 F.3d at 1100, that "Congress recognized that state law would operate in the context of a complex federal scheme which would mold and shape any cause of action grounded in state law").

**Matthews.** In the portion of *Matthews* cited by the district court, the Sixth Circuit noted that the language of Section 2014(hh) did not operate as complete preemption—it "instructs that 'the substantive rules for decision' in a public liability action are 'derived from the law of the State in which the nuclear incident involved

occurs, unless such law is inconsistent with the provisions of Section 2210.'"
*Matthews*, 15 F.4th at 721 (quoting 42 U.S.C. § 2014(hh)). "By incorporating state law
into the federal action, the Act does not entirely displace state law, making the Act
unlike other instances of complete preemption." *Id.* Therefore, the Sixth Circuit
agreed with *O'Conner* that "[s]tate law serves as the basis for the cause of action only
as long as state law is consistent *with the other parts of the Act.*" *Id.* (quoting *O'Conner*, 13
F.3d at 1100) (emphasis added).

Nonetheless, the Sixth Circuit noted that even absent such complete
preemption, the Atomic Energy Act still preempts state law claims for a public liability
action, leaving "'no room' for state law causes of action arising from a nuclear
incident." *Id.* Nothing in *Matthews* supports the district court's interpretation.

**Cook.** *Cook* is the sole outlier in that it appears to share the district court's
overly narrow interpretation of Section 2014(hh) to require direct conflict with a
specific provision of Section 2210. But *Cook* did so in dicta not necessary to the
Tenth Circuit's decision. 618 F.3d at 1142 n.15. *Cook* is also distinguishable because
it did *not* involve a PAA nuclear incident, the defendants waived all preemption
arguments, and the defendants never identified the applicable federal standards, as
Appellants have done here. Moreover, even *Cook* recognized that Section 2014(hh)
"does not displace otherwise applicable federal law. . . . There are other possible
sources of federal law that might preempt state law, and the PAA does not expressly
make these standards irrelevant to resolving a plaintiff's PAA action." *Id.* at 1144. As

the Tenth Circuit explained in *Kerr-McGee*, "state attempts to regulate in this area [of nuclear safety] are preempted." 115 F.3d at 1503.

The district court thus stands alone in its failure to recognize that Section 2014(hh) operates within the context of the overarching federal preemption of nuclear safety standards pronounced repeatedly by the Supreme Court. And ultimately, the district court acknowledged that "every circuit court to consider this issue has held federal law preempts state law standards of care." Add. 25; App. 383; R. Doc. 85, at 19; *see also In re Hanford*, 534 F.3d at 1003 ("Every federal circuit that has considered the appropriate standard of care under the PAA has concluded that nuclear operators are not liable unless they breach federally-imposed dose limits").

## IV. Plaintiffs Must Allege Plausible Facts Showing a Breach of the Federal Dosage Regulations in a Price-Anderson Act Public Liability Action.

As shown by decades of uniform Circuit precedent, to state a plausible claim under the PAA, a plaintiff must allege that the defendant breached the dosage levels permitted by the federal regulations in effect at the time. *See TMI II*, 67 F.3d at 1119; *In re TMI Litig.*, 193 F.3d 613, 659 (3d Cir. 1999). Here, during the alleged conduct, Section 20.105 permitted releases of radiation in whole body doses up to 0.5 rem per individual per year, and Section 20.106 permitted releases of specific radionuclides below set limits. *See* 10 C.F.R. §§ 20.105(a) (1960), 20.106 (1964). But Plaintiffs fail to allege that they were exposed to radiation in excess of the 0.5 mrem limit and specific radionuclides in excess of the levels permitted by Section 20.106.

Plaintiffs' Complaint alleges no exposure level, location, time, or any other facts showing any breach of the federal standard allegedly owed to Plaintiffs. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he complaint has alleged, but it has not 'show[n] . . . that the pleader is entitled to relief.'"). Nowhere do Plaintiffs allege exposure above the federal dosage limit. Instead, they make a general allegation that "Cotter released radiation into unrestricted areas in the environment in excess of the levels permitted by federal regulations in effect at the time, including but not limited to, 10 C.F.R. §§ 20.105 and 20.106." App. 138; R. Doc. 44, at 13. Plaintiffs also list eleven federal regulations in a purported "subpart" claim as potential violations "to the extent applicable." App. 148; R. Doc. 44, at 23. Those conclusory allegations do not commit to any standard of care allegedly owed to Plaintiffs, let alone a breach of that standard, and cannot stave off dismissal. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("'naked assertion[s]' devoid of 'further factual enhancement'" and "formulaic recitation of the elements of a cause of action will not do."); *Adkins v. Chevron Corp.*, 960 F. Supp. 2d 761, 772–73 (E.D. Tenn. 2012) (PAA claim dismissed for similar conclusory pleading of breach of PAA standard of care); *McClurg*, 933 F. Supp. 2d at 1187 (PAA claim insufficient for similar conclusory pleading of PAA standard of care).

At bottom, because Plaintiffs allege no facts showing that they were exposed to radiation at levels above the 0.5 mrem limit permitted by the federal government, and

because Plaintiffs contend they are not required to plead any such facts, Plaintiffs'
Complaint should be dismissed.

## <u>CONCLUSION</u>

For these reasons, Appellants request that this Court hold that the applicable
federal regulations set the standard of care in a Price-Anderson Act public liability
action and reverse the decision of the district court with instructions to dismiss
Plaintiffs' Complaint.

Dated: March 6, 2024          Respectfully submitted,

*/s/ Jennifer Steeve*
RILEY SAFER HOLMES & CANCILA LLP
Brian O. Watson
Lauren E. Jaffe
Lucas Rael
70 W. Madison St., Suite 2900
Chicago, IL 60602
(312) 471-8700
bwatson@rshc-law.com
ljaffe@rshc-law.com
lrael@rshc-law.com

Jennifer Steeve
E. Ashley Paynter
100 Spectrum Center Dr., Suite 650
Irvine, CA 92618
(949) 359-5515
jsteeve@rshc-law.com
apaynter@rshc-law.com

**ATTORNEYS FOR APPELLANTS
COTTER CORPORATION (N.S.L.);
COMMONWEALTH EDISON COMPANY**

ARMSTRONG TEASDALE LLP
Laura A. Bentele
Corey A.-T. Stegeman
7700 Forsyth Blvd., Suite 1800
St. Louis, Missouri 63105
Telephone: 314.621.5070
(314) 621-5070
lbentele@atllp.com
cstegeman@atllp.com

**ATTORNEYS FOR APPELLANT
ST. LOUIS AIRPORT AUTHORITY,
A DEPARTMENT OF THE CITY OF ST.
LOUIS**

## CERTIFICATE OF COMPLIANCE

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6). This document has been prepared in a proportionally spaced typeface using Word 2011 in 14-point font Garamond type style. According to that word processing system, this document contains 9,791 words, excluding parts of the document exempted by Fed. R. App. P. 32(f).

This brief, and its addendum, have been scanned for viruses and are virus-free.

By: */s/ Jennifer Steeve*

## CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2024, I electronically filed this document with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

By: */s/ Jennifer Steeve*