No. 23-3709

# UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

NIKKI STEINER MAZZOCCHIO AND ANGELA STEINER KRAUS,
*Plaintiffs-Appellees,*

v.

COTTER CORPORATION, COMMONWEALTH EDISON COMPANY, AND
ST. LOUIS AIRPORT AUTHORITY, A DEPARTMENT OF
THE CITY OF ST. LOUIS,
*Defendants-Appellants,*

DJR HOLDINGS, INC., FORMERLY KNOWN AS FUTURA COATINGS,
INC.,
*Defendant.*

---

Appeal from U.S. District Court for the Eastern District of Missouri - St. Louis
(4:22-cv-00292-MTS)

---

## APPELLEES' BRIEF

---

Celeste Brustowicz
Victor Cobb
COOPER LAW FIRM
1525 Religious Street
New Orleans, LA 70130
(504) 399-0009

Kevin Thompson
David R Barney, Jr.
2030 Kanawha Boulevard
East Charleston, WV 25311
(304) 343-4401

Ryan A. Keane
Tanner A. Kirksey
KEANE LAW, LLC
7711 Bonhomme Ave
Suite 600
St. Louis, MO 63105
(314) 391-4700

Anthony D. Gray
JOHNSON GRAY, LLC
2705 Dougherty Ferry Rd
Suite 100
St. Louis, MO 63122
(314) 385-9500

*Counsel for Plaintiffs/Appellees*

## SUMMARY OF THE CASE

Applying basic principles of statutory interpretation and federal preemption law, the District Court correctly determined that Appellants "read into the PAA a blanket standard of care that is not based on any provisions in the PAA" and that "requiring a per se rule that PAA actions must be based on a breach of federal regulations conflicts with the plain language of the PAA, Atomic Energy Act, and federal regulations and causes consequences seemingly contrary to Congressional intent." App. 366; R. Doc. 85, at 2.

Instead of relying on the plain language of the Price Anderson Act ("PAA") as the District Court did, Appellants reject it and ask this Court to rely on implied preemption principles which they only alluded to but never fully developed below. Regardless of the untimely nature of this argument, it is contrary to *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238 (1984), the only Supreme Court decision to address the applicability of state *tort law* in the context of the Atomic Energy Act and Price Anderson Act.

Given the "significant federal intrusion into state sovereignty" that federal preemption represents, this Court should decline Appellants' invitation to ignore fundamental principles of statutory interpretation and federal preemption law. *Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1900 (2019).

Appellees agree with the oral argument time requested by Appellants.

# TABLE OF CONTENTS

SUMMARY OF THE CASE .................................................................. ii

STATEMENT OF THE ISSUES ............................................................1

STATEMENT OF THE CASE ...............................................................2

    I.   Facts ........................................................................................2

        A.   Uranium is Processed in Downtown St. Louis and Wastes Are Transported to the St. Louis Airport Site ................................2

        B.   Continental Milling and Mining Purchased Radioactive Waste and Moved It to Latty Avenue ..................................3

        C.   Cotter Corporation Purchased and Took Responsibility for the Radioactive Waste at Latty Site and Conducted Drying Operations ..................................................................................3

        D.   Cotter Dumped Thousands of Tons of Radioactive Wastes at the West Lake Landfill. ................................................4

        E.   ComEd Purchased Cotter and Cotter's License is Terminated ..............5

        F.   Testing at the Latty Site Found Radiation Levels Exceeding Federal Guidelines ..................................................5

        G.   Jarboe Purchased the Latty Site and Conducted Decontamination .........6

        H.   Plaintiffs Were Exposed to Radiation Released by Defendants Causing Them to Develop Cancer ..........................................6

    II.   Procedural History .........................................................................7

        A.   Case is Filed in State Court, then Removed and Stayed ........................7

        B.   Plaintiffs Amend to Allege a "Public Liability Action" ........................7

        C.   District Court Denies Defendants' Motions to Dismiss ..........................8

    III.  Relevant Statutory and Regulatory Background ...........................................10

A.  Enactment of the Atomic Energy Act and Promulgation of Federal Regulations ...............................................................10

B.  Enactment of the Price Anderson Act...................................11

C.  1966 Amendments to the Price Anderson Act .....................12

D.  1988 Amendments to the Price Anderson Act .....................13

SUMMARY OF ARGUMENT ..............................................................16

ARGUMENT .........................................................................................21

I.  Federal Regulations Do Not Preempt State Tort Standards of Care in a "Public Liability Action" ...........................................................21

A.  General Principles and Types of Federal Preemption ...........21

B.  Appellants' Interpretation Is Inconsistent with the Plain Language – The PAA Does Not Expressly Preempt State Law Standards of Care...................................................................23

C.  Supreme Court Precedent Demonstrates No Implied Preemption – The Atomic Energy Act Does Not Preempt State Tort Law .............26

D.  The 1988 Amendments to the PAA Reaffirm *Silkwood*........................32

E.  The District Court Opinion is Consistent with the Uniformity Congress Sought with the 1988 Amendments......................................33

F.  Appellants' Interpretation is Contrary to a "Cardinal Attribute" of the PAA: Minimal Interference with State Law ...................................35

G.  Appellants' Argument is Contrary to NRC Intent and the Primary Purpose of the PAA – Protecting the Public.........................................37

H.  Other Circuits Ignore Plain Language and Misinterpret Supreme Court Precedent.....................................................................................39

I.  The Consequences of Appellants' Interpretation Raises Serious Constitutional Problems.........................................................................43

II.  Assuming Arguendo That Plain Language is Not Controlling, Plaintiffs Have Alleged Sufficient Facts to Establish a Breach of Federal Regulations ........................................................................46

　　A.  Plaintiffs Allege Facts to Demonstrate it is Plausible Cotter Breached Federal Regulations ...............................................47

　　B.  Plaintiffs Allege Facts to Demonstrate it is Plausible Their Exposure Was in Excess of Background ...............................50

　　C.  As Plaintiffs Have Alleged *TMI*'s Elements One and Two Sufficiently, the District Court was Incorrect in Stating a Reversal Based on a Federal Standard of Care May Allow for Dismissal of Plaintiffs' Complaint ......................................52

CONCLUSION ......................................................................................52

CERTIFICATE OF SERVICE ..............................................................54

CERTIFICATE OF COMPLIANCE......................................................55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Almendarez-Torres v. United States*,
    523 U.S. 224 ................................................................. 20, 44

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...........................................................50

*Cipollone v. Liggett Grp., Inc.*,
    505 U.S. 504 (1992) ..................................................... 22, 26

*Cook v. Rockwell Int'l Corp.*,
    618 F.3d 1127 (10th Cir. 2010)..................................... 25, 30

*Cook v. Rockwell Int'l Corp.*,
    790 F.3d 1088 (10th Cir. 2015)................................... passim

*Cotroneo v. Shaw Env't & Infrastructure, Inc.*,
    639 F.3d 186 (5th Cir. 011) ...............................................41

*Cotter Corp. (N.S.L.) v. United States*,
    165 Fed. Cl. 138 (2023)......................................................3

*El Paso Nat. Gas Co. v. Neztsosie*,
    526 U.S. 473 (1999) ..................................................... 23, 24

*Goodyear Atomic Corp. v. Miller*,
    486 U.S. 174 (1988) ...........................................................30

*Halbrook v. Mallinckrodt, LLC*,
    888 F.3d 971 (8th Cir. 2018) .......................................1, 42

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
    530 U.S. 1 (2000) ........................................................ 16, 23

*In re Cotter Corp.*, (N.S.L.),
    22 F.4th 788 (8th Cir.) .......................................................7

*In re Hanford Nuclear Rsrv. Litig.*,
    534 F.3d 986 (9th Cir. 2008) ........................................................ 41, 45

*In re TMI Litig. Cases Consol. II,*
    940 F.2d 832 (3d Cir. 1991) ......................................... 20, 39, 40, 42

*In re TMI Litig.*,
    193 F.3d 613 (3d Cir. 1999) ........................................... 21, 46, 52

*Jones v. Rath Packing Co.*,
    430 U.S. 519 (1977) ....................................................................22

*Kerr-McGee Corp. v. Farley*,
    115 F.3d 1498 (10th Cir. 1997) ..............................................41

*Mallinckrodt, Inc. v Bennett*,
    698 S.W. 2d 854 (Mo. Ct. App 1985) .....................................36

*McClurg v. Mallinckrodt, Inc.*,
    No. 4:12-CV-00361-AGF, 2017 WL 2929444 (E.D. Mo. July 7, 2017)...... 47, 50

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996) ............................................................ 21, 22

*N. States Power Co. v. State of Minn.*,
    447 F.2d 1143 (8th Cir. 1971) .................................................27

*Nieman v. NLO, Inc.*,
    108 F.3d 1546 (6th Cir. 1997) ............................................ 40, 41

*O'Conner v. Commonwealth Edison Co.*,
    13 F.3d 1090 (7th Cir. 1994) ................................................40

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
    461 U.S. 190 (1983) ........................................................... 27, 39

*Rice v. Sante Fe Elevator Corp.*,
    331 U.S. 218 (1947) ........................................................... 16, 22

*Roberts v. Fla. Power & Light Co.*,
    146 F.3d 1305 (11th Cir. 1998)..............................................41

*Silkwood v. Kerr-McGee Corp.,*
   464 U.S. 238 (1984) ................................................................... passim

*Silkwood v. Kerr-McGee Corp.,*
   485 F. Supp. 566 (W.D. Okla. 1979) ........................................... 28, 29

*Silkwood v. Kerr-McGee Corp.,*
   667 F.2d 908 (10th Cir. 1981) ............................................................29

*Virginia Uranium, Inc. v. Warren,*
   139 S. Ct. 1894 (2019).......................................................... 16, 22, 25

*Wyeth v. Levine,*
   555 U.S. 555 (2009) .................................................................. 16, 21

## Statutes

42 U.S.C. § 2014 ...................................................................... passim

42 U.S.C. § 2210 ...................................................................... passim

## Other Authorities

Pub. L. 79-585 (1946), 60 Stat. 755 ........................................................10

Pub. L. 83-703 (1954), 68 Stat. 919 ........................................................10

Pub. L. 85–256 (1957), 71 Stat. 576 .......................................................11

Pub. L. 89–645 (1966), 80 Stat. 891 .......................................................12

Pub. L. 100–408 (1988), 102 Stat. 1066 ............................................ 13, 14

10 C.F.R. § 20.105 ........................................................... passim

10 C.F.R. § 20.106 ........................................................... passim

10 C.F.R. § 20.3 .......................................................................50

22 Fed. Reg. 548 (1957) ............................................................... 11, 45

25 Fed. Reg. 10914 (1960) ....................................................................45

H.R. Rep. No. 100-104 (1987).......................................... 18, 19, 34, 37

S. Rep. No. 85-296 (1957) ...................................................... 11, 12, 20, 38

S. Rep. No. 89-1605 (1966) ............................................................ passim

S. Rep. No. 100-218 (1987) ............................................................ passim

# STATEMENT OF THE ISSUES

**Issue:**

Whether federal dosage standards should be exclusively utilized as the standard of care in a Price-Anderson Act public liability action (42 U.S.C. § 2210)?

**Apposite cases**:

1. *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238 (1984);

2. *Halbrook v. Mallinckrodt, LLC*, 888 F.3d 971 (8th Cir. 2018);

3. *Cook v. Rockwell Int'l Corp.*, 790 F.3d 1088 (10th Cir. 2015); and

4. *In the Matter of A.N. Tschaeche*, 23 N.R.C. 461 (Apr. 23, 1986).

**Apposite statutory provisions**:

1. 42 U.S.C. § 2210; and

2. 42 U.S.C. § 2014

# STATEMENT OF THE CASE

## I.  Facts

The chronological journey of the radioactive waste at issue is important in showing just how impracticable it would be to establish an exclusive federal standard of care in all public liability actions, for all defendants, arising out of every "nuclear incident".

### A.  Uranium is Processed in Downtown St. Louis and Wastes Are Transported to the St. Louis Airport Site

From 1942 to 1957, under contracts with US government, Mallinckrodt processed natural uranium at a site in downtown St. Louis. App. 135; R. Doc. 44, at 10. The uranium processed by Mallinckrodt came from the Belgian Congo, and the elemental composition of the resulting waste material is unique. *Id.* Between 1947 and 1957, Mallinckrodt transported the radioactive wastes created by this processing to a site in North St. Louis County near the Lambert Airport, known as the St. Louis Airport Site ("SLAPS"). *Id.* Appellant St. Louis Airport Authority is the current owner of the SLAPS site. App. 135-136; R. Doc. 44 at 10-11. Despite knowing that significant activities involving radioactive material were conducted on the site, the Airport Authority did nothing after purchasing the site to prevent the dispersal of radioactive waste into Coldwater Creek. App. *Id.*

**B. Continental Milling and Mining Purchased Radioactive Waste and Moved It to Latty Avenue**

In 1966, the United States sold, and Continental Milling & Mining Company purchased and assumed responsibility for, the radioactive waste stored at the SLAPS site. App. 136; R. Doc. 44 at 11. Continental then moved the radioactive waste from the SLAPS site to a site on Latty Avenue next to Coldwater Creek. *Id*. Mallinckrodt's relationship to the waste ceased at this time.[1]

**C. Cotter Corporation Purchased and Took Responsibility for the Radioactive Waste at Latty Site and Conducted Drying Operations**

Three years later, in 1969, Appellant Cotter Corporation purchased the radioactive waste stored at the Latty Avenue site. App. 136; R. Doc. 44 at 11. Cotter exercised custody and control over the radioactive waste and the Latty Avenue site pursuant to a source material license issued by the AEC. *Id*. However, Cotter never maintained financial protection[2] or had an indemnification agreement[3] pursuant to the Price Anderson Act ("PAA") for its Latty operations. App. 138; R. Doc. 44 at 13.

---

[1] None of the Appellants ever conducted any activities related to Mallinckrodt's contract, or any other contract with the government. App. 138; R. Doc. 44 at 13. See also *Cotter Corp. (N.S.L.) v. United States*, 165 Fed. Cl. 138, 149 (2023) ("The Court agrees with the United States that Cotter's ownership over the radioactive material was too far 'downstream' from Mallinckrodt, rendering it outside the Section [2210(d)] indemnification obligation.").

[2] 42 U.S.C. §§ 2210(a), 2210(b).

[3] 42 U.S.C. §§ 2210(c).

After purchasing and assuming responsibility for the radioactive waste at Latty, Cotter dried and loaded the waste onto railcars next to Coldwater Creek at a rate of approximately 400 tons per day. App. 137; R. Doc. 44 at 12. During this drying and loading operation, the AEC expressed concerns about a dust problem; it cited Cotter because sample surveys were "totally inadequate." *Id*. The St. Louis County Health Department noted violations related to the restriction of emission of visible air contaminants. *Id*. Health and environmental experts expressed concerns and noted violations of AEC regulations. *Id*. Then at some point during Cotter's Latty operation, its dryer broke down and the site was abandoned and not secured. *Id*.

As a result of Cotter's acts and omissions at the Latty site, Cotter released radiation into unrestricted areas in the environment in excess of the levels permitted by federal regulations in effect at the time, including but not limited to, 10 C.F.R. §§ 20.105 and 20.106. App. 138; R. Doc. 44 at 13.

### D. Cotter Dumped Thousands of Tons of Radioactive Wastes at the West Lake Landfill.

In 1973, approximately 18,700 tons of Cotter's radioactive wastes remained at the Latty site. Cotter loaded approximately 10,000 tons of these wastes onto railcars and shipped them to Colorado. Cotter mixed the remaining 8,700 tons with contaminated soil and dumped them in the West Lake Landfill. App. 138; R. Doc. 44 at 13.

### E. ComEd Purchased Cotter and Cotter's License is Terminated

On May 8, 1974, Appellant Commonwealth Edison Company ("ComEd") purchased Cotter.[4] App. 138; R. Doc.44 at 13. Two days later, Cotter filed an application to terminate its source material license. App. 139; R. Doc. 44 at 14. Cotter certified that all of the radioactive waste at the Latty site had been removed and the site was decontaminated. *Id*. After conducting no independent testing of its own, the AEC terminated Cotter's license on November 13, 1974. *Id*.

### F. Testing at the Latty Site Found Radiation Levels Exceeding Federal Guidelines

Despite Cotter's certification that the Latty site was decontaminated, testing conducted in 1976 showed radiation levels exceeding federal guidelines. App. 139; R. Doc.44, at 14. Surveys conducted in 1977 showed the Latty site still contained licensable quantities of source material. *Id*. Thereafter, the NRC informed Cotter and ComEd that the testing "raised a serious question as to whether statements Cotter Corporation made in its application for termination of its license, with regard to contamination levels and removal of all licensable materials, were correct and, hence, whether the Commission's action terminating your license was founded on accurate representations by you." *Id*.

---

[4] ComEd controlled the policy and business of Cotter such that Cotter was a mere instrument or alter ego of ComEd. App. 131; R. Doc. 44 at 6. ComEd used it control to perpetuate the negligent and unlawful contamination in contravention of Plaintiffs' rights. *Id*.

**G. Jarboe Purchased the Latty Site and Conducted Decontamination**

In 1978, Defendant Jarboe Realty and Investment Company purchased the Latty site. App. 140; R. Doc. 44, at 15. In 1979, the owner of Jarboe Realty and Investment Company, Dean Jarboe, conducted decontamination operations at the Latty site by excavating 11,000 cubic yards of contaminated soil from the western half of the property (by Coldwater Creek) and moving it to the eastern half. *Id*. Jarboe was never a licensee of the AEC or NRC. App. 143; R. Doc. 44, at 18.

**H. Plaintiffs Were Exposed to Radiation Released by Defendants Causing Them to Develop Cancer**

Defendants' acts and omissions at the SLAPS and Latty sites have caused the deposition of radioactive waste on the properties where Plaintiffs lived, gardened, and frequented (and where Plaintiff Mazzocchio worked). Flooding of Coldwater Creek is a significant contributor to the deposition of radiation on these properties. App. 141, R. Doc. 44, at 16.

Importantly, the radioactive materials deposited on the properties where Plaintiffs lived, worked, gardened, and frequented is unique and identifiable from naturally occurring Missouri radiation and matches the waste fingerprint (or profile) of the radioactive material stored at SLAPS and Latty. App. 142; R. Doc. 44 at 17. As a result of Defendants' acts and omissions, Plaintiffs were exposed to radiation and this exposure caused or contributed to cause them to develop cancer. *Id*.

## II.  Procedural History

### A.  Case is Filed in State Court, then Removed and Stayed

This action was originally filed in Missouri state court in January 2022. Plaintiffs' claims were brought under Missouri law because none of the Defendants had a license or indemnity agreement pursuant to the PAA, 42 U.S.C. §2210. App. 12-45; R. Doc. 5. Cotter removed, arguing the PAA provided federal court jurisdiction because Plaintiffs alleged a "nuclear incident." *See* 42 U.S.C. § 2014(q). R. Doc. 1. Cotter Corporation, Commonwealth Edison, and DJR Holdings, Inc. then filed motions to dismiss asserting that Plaintiffs had failed to allege claims under the PAA.  R. Docs. 12-15, 22-23. Before Plaintiffs responded to these motions, this matter was stayed while plaintiffs in a related action sought Supreme Court review of this Court's decision in *In re Cotter Corp*., (N.S.L.), 22 F.4th 788 (8th Cir.) (2022). App. 120-121; R. Doc. 27. After the Supreme Court denied review, the stay was lifted. App. 125; R. Doc. 33.

### B.  Plaintiffs Amend to Allege a "Public Liability Action"

After the stay was lifted, consistent with this Court's determination in *In re Cotter,* Plaintiffs amended their complaint to affirmatively allege a "public liability action" arising from a "nuclear incident." App. 127, 144; R. Doc. 44, at 2, 19. Relying on the plain language of the PAA, Plaintiffs alleged a single "public liability

action" incorporating theories of lability "derived from the law of the State in which the nuclear incident occurr[ed]." 42 U.S.C. § 2210(hh). App. 145; R. Doc. 44 at 20.

## C. District Court Denies Defendants' Motions to Dismiss

After Plaintiffs amended, Defendants filed motions to dismiss. Defendants argued that federal radiation dose levels set by the Nuclear Regulatory Commission exclusively establish the standard of care in all public liability actions arising out of a "nuclear incident". App. 375; R. Doc. 85 at 11. Analyzing the PAA issues before it through the "lens" of this Court, the District Court determined Defendants' exclusive standard-of-care argument conflicts with the plain language of the PAA which "dictates the PAA preempts state law when inconsistent with Section 2210 *only*." App. 377; R. Doc. 85 at 13. The court reasoned that "[h]ad Congress intended to limit PAA claims to actions based exclusively on breaching federal dosage regulations, it could have done so[.]" *Id*. Consistent with the plain language of the PAA, the District Court determined "Congress chose to specifically preserve state tort law" and "[n]othing in the text of the PAA or Section 2210 immunizes Defendants from liability for all claims except those based on a breach of federal dosage limits." App. 377-378; R. Doc. 85 at 13-14.

The District Court also determined that Appellants' exclusive standard of care argument is inconsistent with this Court's decision in *In re Cotter*. App. 379; R. Doc. 85, at 15. Recognizing that the federal regulations Appellants seek to import as

the exclusive standard of care are, by their plain language, imposed only on NRC licensees, the District Court determined that Appellants' interpretation "is in conflict" with *In re Cotter* (which concluded the PAA broadly applies to all "nuclear incident" claims and is not dependent on licensee status). App. 381; R. Doc. 85, at 17. As stated by the District Court, "[s]urely, the Court cannot hold that non-licensees owe a duty of care that is solely imposed on NRC licensees, as dictated by the plain language of the federal regulations." App. 380-381; R. Doc. 85, at 16-17. The court rejected this interpretation, and determined "[t]here is nothing in the definition of 'nuclear incident' that suggests it should be contingent on breaching Part 20 dosage regulations promulgated by the NRC." *Id*. Next, the court found that "[s]imilar to the interpretation rejected by the Eighth Circuit in *In Re Cotter*, Defendants here seek to import requirements from one portion of the statute and impose them into others[.]" App. 381; R. Doc. 85, at 17. The Court reasoned that if Congress sought to impose NRC regulatory requirements for all "nuclear incidents", "it could have done so." App. 382; R. Doc. 85, at 18.

The District Court then responded to circuit court decisions that found federal regulations preempt state law standards of care. App. 382; R. Doc. 85, at 19. Because these cases are factually different and based on ordinary preemption principles, an argument that Appellants only "allude[d]" to and "never developed", the District Court correctly determined "the applicable standard of care depends on the facts of

each case and the claims asserted against each defendant. Then, by applying ordinary preemption principles, the Court would determine the applicable standard(s) of care." App. 382-383; R. Doc. 85, at 19-20.

Consistent with the court's duty to respect not only what Congress wrote but, as importantly, what it did not write, the District Court determined that:

> Defendants read into the PAA a blanket standard of care that is not based on any provisions in the PAA. In fact, requiring a per se rule that PAA actions must be based on a breach of federal regulations conflicts with the plain language of the PAA, Atomic Energy Act, and federal regulations and causes consequences seemingly contrary to Congressional intent.

App. 366; R. Doc. 85, at 2.

## III. Relevant Statutory and Regulatory Background

### A. Enactment of the Atomic Energy Act and Promulgation of Federal Regulations

In 1946, the Atomic Energy Act ("AEA") created the Atomic Energy Commission ("AEC") and a monopoly in favor of the federal government over all nuclear materials. Pub. L. 79-585 (1946), 60 Stat. 755. The AEA was amended in 1954 to eliminate the federal monopoly over the atomic industry and provide for private involvement in the development of atomic energy. Pub. L. 83-703 (1954), 68 Stat. 919. The AEC was then tasked with establishing a system of licensing and regulation. *Id*. On January 29, 1957, the AEC promulgated 10 C.F.R. Part 20,

establishing standards for protection against radiation hazards arising out of activities under licenses issued by the AEC. 22 Fed. Reg. 548 (1957).

## B.    Enactment of the Price Anderson Act

The Price Anderson Act was enacted in 1957 for two purposes: (1) to protect the public by ensuring adequate funds would be available to satisfy liability claims; and (2) to encourage the development of the atomic energy industry by removing the deterrent of uninsurable liability associated with catastrophic losses emanating from nuclear power plants. Pub. L. 85-256 (1957), 71 Stat. 576. Under the PAA, certain licensees were required to obtain the maximum amount of insurance available from private sources, defined as "financial protection", and in exchange the federal government would indemnify them up to $500 million. *Id*. (*See* 42 U.S.C. §§ 2210(a), 2210(b), 2210(c)).[5] The PAA also capped the amount of liability for a single nuclear incident at the amount of financial protection plus $500 million in government indemnification. *Id*. (*See* 42 U.S.C. §§ 2210(e)).

The primary concern of the federal government in enacting the PAA was the "protection to the people who might suffer damage from the new atomic energy industry." S. Rep. No. 85-296, at 15 (1957), *reprinted in* 1957 U.S.C.C.A.N. 1803,

---

[5] None of the Appellants have ever maintained financial protection or had an indemnification agreement with the federal government.

1816. Furthermore, Congress intended that the PAA interfere with state law to the minimum extent possible:

> Since the rights of third parties who are injured are established by state law, there is no interference with state law until there is a likelihood that the damages exceed the amount of financial responsibility required together with the amount of the indemnity. At that point the federal interference is limited to the prohibition of making payments through the state courts and to prorating the proceeds available.

S. Rep. No. 85-296, at 9 (1957), *reprinted in* 1957 U.S.C.C.A.N. 1803, 1810.

## C. 1966 Amendments to the Price Anderson Act

Following the PAA's enactment, "a number of problem areas were identified relating to the means by which persons suffering damage from a nuclear incident might obtain rapid and adequate financial compensation". S. Rep. No. 89-1605, at 3 (1966), *reprinted in* 1966 U.S.C.C.A.N. 3201, 3203. More specifically, there was "concern expressed…over the fact that there was no assurance that all State courts would impose a rule of strict liability in the event of a nuclear incident." *Id.*

In response, Congress amended the PAA in 1966 by introducing the concept of an "extraordinary nuclear occurrence" (ENO) and requiring Defendants to waive certain defenses when a nuclear incident is determined to be "substantial" enough to be an ENO. Pub. L. 89-645 (1966), 80 Stat. 891. Congress also provided a mechanism for consolidating lawsuits arising from an ENO in federal court. *Id.*[6]

---

[6] *See* 42 U.S.C. § 2210(n).

This waiver of defense approach was determined to be a "preferable alternative to enactment of a new body of Federal tort law" and "in keeping with the approach followed in enacting the original Price-Anderson Act – namely, interfering with State law to the minimum extent necessary." S. Rep. No. 89-1605, at 9 (1966), *reprinted in* 1966 U.S.C.C.A.N. 3201, 3209. For non-ENO nuclear incidents, "a claimant would have exactly the same rights that he has today under existing law--including, perhaps, benefit of a rule of strict liability if applicable State law so provides. Thus, this bill in no way provides for deprivation of a claimant's existing rights." S. Rep. No. 89-1605, at 12 (1966), *reprinted in* 1966 U.S.C.C.A.N. 3201, 3212.

### D.   1988 Amendments to the Price Anderson Act

In response to two separate developments, Congress amended the PAA again in 1988. Pub. L. 100–408 (1988), 102 Stat 1066. First, Congress responded to the litigation that followed the Three Mile Island accident—which resulted in lawsuits filed in various state and federal courts, and demonstrated a need for a mechanism to consolidate claims for nuclear incidents not deemed to be ENOs. S. Rep. No. 100-218, at 13 (1987), *reprinted in* 1988 U.S.C.C.A.N. 1476, 1488. To "avoid the inefficiencies resulting from duplicative determinations of similar issues in multiple jurisdictions that may occur in the absence of consolidation", Congress expanded

existing law to allow for the "consolidation of claims" arising out of any nuclear incident in federal district court. *Id*.

To accomplish this goal, Congress created a "public liability action" for all claims arising out of or resulting from a "nuclear incident". Pub. L. 100–408 (1988), 102 Stat 1066. Congress directed that the federal district court located where the nuclear incident occurred have original jurisdiction over such actions. *Id*.[7] Consistent with the congressional goal of minimal interference with state law, however, Congress specifically provided that "[a] public liability action shall be deemed to be an action arising under *section 2210 of this title*, and the substantive rules for decision in such action shall be derived from the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of *such section*." *Id*. (emphasis added).[8]

Second, the 1988 amendments responded to the Supreme Court's decision in *Silkwood v. Kerr-McGee Corp*., 464 U.S. 238 (1984) by adding 42 U.S.C. § 2210(s). Section 2210(s) provides that "[n]o court may award punitive damages in any action with respect to a nuclear incident … against a person on behalf of whom the United States is obligated to make payments under an agreement of indemnification covering such incident or evacuation." Pub. L. 100–408 (1988), 102 Stat 1066. This

---

[7] *See* 42 U.S.C. § 2014(hh); 42 U.S.C. § 2210(n)(2).
[8] *See* 42 U.S.C. § 2014(hh).

provision was added to reflect "longstanding policy that the Federal government should not be liable for punitive damages" and to "clarif[y] that an award of punitive damages is prohibited if the award would result in any obligation of the United States to make any payments for public liability." S. Rep. 100-218, at 12 (1987), *reprinted in* 1988 U.S.C.C.A.N. 1476, 1487. The amendment "does not otherwise affect current law regarding punitive damages." S. Rep. 100-218, at 13 (1987), *reprinted in* 1988 U.S.C.C.A.N. 1476, 1488.

## SUMMARY OF ARGUMENT

When determining whether (and to what extent) federal law preempts state law, there are several principles of statutory interpretation that should be followed. The purpose of Congress is the "ultimate touchstone" of preemption analysis and federal law should not be read to preempt state law "unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009); *Rice v. Sante Fe Elevator Corp*., 331 U.S. 218, 230 (1947). Given the "significant federal intrusion into state sovereignty" in the field of federal preemption, "it is our duty to respect not only what Congress wrote but, as importantly, what it didn't write." *Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1900 (2019). It would represent a "significant judicial intrusion into Congress' authority to delimit the preemptive effect of its laws." *Id*. at 1904-1905.

The starting point in construing a statute is the language of the statute itself. When a statute's language is plain, the sole function of the courts is to enforce it according to its terms. *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000). The PAA provides that "[a] public liability action shall be deemed to be an action arising under ***section 2210 of this title***, and the substantive rules of decision in such action shall be derived from the law of State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of ***such section***." 42 U.S.C. § 2014(hh) (emphasis added).

Relying on the plain language of Section 2014(hh), the district court correctly determined that the PAA clearly stakes out the boundaries of the preempted field in a "public liability action" – laws that are inconsistent with a provision of Section 2210 *only*. App. 377; R. Doc. 85 at 13. Here, Appellants fail to point to a single provision of Section 2210 which conflicts with state law standards of care. This should be the end of the analysis because the PAA's express preemption language is the best indication of Congressional intent.

Unable to establish that the PAA preempts the standards of care alleged by Appellees, Appellants urge that this Court ignore the plain language and instead rely on implied preemption principles which they only alluded" to and "never developed" in the district court. Regardless, Appellants argument is contrary to *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238 (1984), the only Supreme Court decision to address the applicability of state tort law in the context of the Atomic Energy Act and Price Anderson act. In Silkwood, the Supreme Court found that "[i]t may be that the award of damages based on the state law of negligence or strict liability is regulatory in the sense that a nuclear plant will be threatened with damages liability if it does not conform to state standards, but that regulatory consequence was something that Congress was quite willing to accept." *Id*. at 256. Simply put, *Silkwood* directly addressed and rejected the implied preemption arguments raised by Appellants here.

In 1988, Congress limited *Silkwood*'s holding by providing that punitive damages are prohibited when the US government would be obligated to make payments under an indemnification agreement. Critically, Congress did not reject *Silkwood* by prohibiting punitive damages in all cases. It only limited to punitive damages to honor the longstanding policy that the federal government should not be liable for punitive damages. S. Rep. 100-218, at 12-13 (1987), *reprinted in* 1988 U.S.C.C.A.N. 1476, 1487-88. Congress' affirmation of Silkwood is further demonstrated in the language chosen by Congress when defining a "public liability action", which expressly incorporates substantive state law. 42 U.S.C. § 2014(hh)

Contrary to the position held by amicus American Nuclear Insurers, the district court's opinion is consistent with the uniformity Congress sought to achieve with the 1988 amendments. Instead of implementing a uniform nationwide standard of care in all PAA actions as ANI contends, the 1988 amendments provided for removal to and original jurisdiction in federal court to avoid the inefficiencies associated with litigation in multiple jurisdictions and "to ensure the equitable and uniform treatment of all victims." H.R. Rep. No. 100-104, pt. 2 at 19 (1987). Simply put, ANI's position is contrary to congressional intent and inconsistent with the plain language of the PAA.

"Since its enactment by Congress in 1957 one of the cardinal attributes of the Price Anderson Act has been its minimal interference with State law. Under the Price

Anderson system, the claimant's right to recover from the fund established by the act is left to the tort law of the various States." S. Rep. No. 89-1605, at 6 (1966), *reprinted in* 1966 U.S.C.C.A.N. 3201, 3206. This principle of minimal interference with state law is reflected in each of the amendments to the PAA. For example, Congress reaffirmed the principle of minimal interference in 1988 when it rejected a proposed amendment which would have excluded public liability claims when federal regulations are not breached. Congress reasoned that the proposed amendment "would have preempted state tort law by expressly prohibiting suits for damages resulting from emissions of radioactive materials at levels permitted by the NRC, despite the policy of only interfering with state tort law to the minimum extent necessary—a principle which has been embodied in the Price-Anderson Act for the last 30 years." H.R. Rep. No. 100-104, pt. 1, at 20 (1987).

The NRC addressed a similar proposal and denied it because "it is inconsistent with the intent of the Commission's regulations[.]" *In the Matter of A.N. Tschaeche*, 23 N.R.C. 461 (Apr. 23, 1986). The NRC reasoned that "the Commission has never taken the position that there is a level of radiation exposure below which one can conclusively presume that nor injury will result." *Id*. If Appellants are correct, the numerical dose standards would act as a safe harbor for the nuclear industry regardless of whether injuries are caused. This is contrary to the NRC's intent and the primary concern of the federal government in enacting the PAA – "protection to

the people who might suffer damage from the new atomic energy industry." S. Rep. No. 85-296, at 15 (1957), *reprinted in* 1957 U.S.C.C.A.N. 1803, 1816.

Despite the plain language of the PAA, Appellants rely on decisions out of other circuits to support their position. However, a review of these cases demonstrates that they are factually different, and many do not conclude what Appellants claim. Moreover, these cases all trace back to the Third Circuit's decision in *In re TMI Litig. Cases Consol. II,* 940 F.2d 832 (3d Cir. 1991), which ignores the plain language of the PAA and fails to properly interpret the Supreme Court's decision in *Silkwood*.

Deviating from interpretation based on plain language results in a couple of unintended consequences which are contrary to congressional and regulatory intent. For example, requiring a breach of a standard of care for property damage claims such as trespass and nuisance, which do not require a breach of duty, would mean the elimination of basic property rights. This was not Congress's intent and this interpretation raises serious constitutional problems which this Court should avoid. See *Almendarez-Torres v. United States*, 523 U.S. 224, 237–38 (1998). Moreover, applying an exclusive standard of care in every PAA action would require the Court to hold that non-licensees owe a duty of care that is solely imposed on NRC licensees, as dictated by the plain language of the federal regulations.

Finally, even if Appellants' arguments on an exclusive federal standard of care were correct—which they are not—Plaintiffs-Appellees have sufficiently pled a breach of the federal regulations that might establish such a standard. Specifically, Plaintiffs have plausibly alleged "(1) the defendants released radiation into the environment in excess of the levels permitted by federal regulations in effect [at the time of the alleged nuclear incident]; [and] (2) the plaintiffs were exposed to this radiation (although not necessarily at levels prohibited by those regulations)[.]" *In re TMI Litig.*, 193 F.3d 613, 659 (3d Cir. 1999) (citations omitted), *amended*, 199 F.3d 158 (3d Cir. 2000)).

## ARGUMENT

### I. Federal Regulations Do Not Preempt State Tort Standards of Care in a "Public Liability Action"

#### A. General Principles and Types of Federal Preemption

The Supreme Court has repeatedly explained that in determining whether (and to what extent) federal law preempts state law, the purpose of Congress is the "ultimate touchstone" of its statutory analysis. *Wyeth*, 555 U.S. at 565. The Court has further instructed that Congress's intent is discerned "primarily" from a statute's text. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996) (internal quotation marks and citation omitted). In evaluating congressional purpose, the Court has at times employed a canon of construction commonly referred to as the "presumption against preemption," which instructs that federal law should not be read to preempt state law

"unless that was the clear and manifest purpose of Congress." *Rice v. Sante Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

The preemption of state laws represents "a serious intrusion into state sovereignty." *Medtronic*, 518 U. S. at 488. "Invoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law; a litigant must point specifically to 'a constitutional text or a federal statute' that does the displacing or conflicts with state law." *Virginia Uranium, Inc.*, 139 S. Ct. at 1901. "[T]o order preemption based not on the strength of a clear congressional command, or even on the strength of a judicial gloss requiring that much of us, but based only on a doubtful extension of a questionable judicial gloss would represent not only a significant federal intrusion into state sovereignty. It would also represent a significant judicial intrusion into Congress's authority to delimit the preemptive effect of its laws." *Id*. at 1904–05.

There are two basic types of preemption. There is express preemption (i.e., when a federal statute or regulation contains express preemptive language), and there is implied preemption (i.e., when a federal law's structure and purpose implicitly reflect Congress's preemptive intent). See *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (citing *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977)). There are two types of implied preemption. There is field preemption (i.e., when a pervasive scheme of federal regulation implicitly precludes supplementary state

regulation), and there is conflict preemption (i.e., when simultaneous compliance with both federal and state regulation is impossible, known as impossibility preemption, or when state law imposes an obstacle to the full purposes and objectives of Congress, known as obstacle preemption). *See Silkwood*, 464 U.S. at 248.

**B.    Appellants' Interpretation Is Inconsistent with the Plain Language – The PAA Does Not Expressly Preempt State Law Standards of Care**

The starting point in construing a statute is the language of the statute itself. When a statute's language is plain, the sole function of the courts is to enforce it according to its terms. *Hartford Underwriters Ins. Co.*, 530 U.S. at 6. With respect to preemption, the PAA provides that "[a] public liability action shall be deemed to be an action arising under **section 2210 of this title**, and the substantive rules of decision in such action shall be derived from the law of State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of **such section**." 42 U.S.C. § 2014(hh) (emphasis added).

According to the U.S. Supreme Court, this "unusual" preemption provision "resembles" "complete preemption" while not actually constituting complete preemption. *El Paso Nat. Gas Co. v. Neztsosie,* 526 U.S. 473 (1999). It simply transforms any public liability action arising out of or resulting from a nuclear incident into a federal action, and it grants a district court original jurisdiction over

such a claim. *Id*. The Supreme Court reasoned that "Congress expressed an unmistakable preference for a ***federal forum*** … both for litigating a Price–Anderson claim on the merits and for determining whether a claim falls under Price–Anderson when removal is contested." *Id*. at 484-485. (emphasis added). According to *Neztsosie*, a federal "public liability action" is "***one decided under substantive state-law rules of decision*** that do not conflict with the Price-Anderson Act." *Id. at* 485. (emphasis added).

As stated by now Supreme Court Justice Gorsuch, the PAA's preemption provision "merely affords a federal forum when a nuclear incident is 'assert[ed]' and provides a modest form of conflict preemption once the case is underway: normal state law principles continue to govern unless they conflict with the rules found in § 2210." *Cook v. Rockwell Int'l Corp*., 790 F.3d 1088, 1095 (10th Cir. 2015) (emphasis added).

Here, utilizing basic principles of statutory interpretation and relying on the plain language of the PAA, the District Court correctly determined that 42 U.S.C. § 2014(hh) dictates that state law governs unless inconsistent with 42 U.S.C. § 2210 ***only***. App. 377; R. Doc. 85 at 13. If Congress intended otherwise, it "could have done so" by stating that substantive rules are derived from state law unless inconsistent with the provisions of "this Chapter" or "federal regulations." However,

the language chosen was "inconsistent with the provisions of [section 2210]." 42 U.S.C. § 2014(hh).

"In this, as in any field of statutory interpretation, it is our duty to respect not only what Congress wrote but, as importantly, what it didn't write." *Virginia Uranium, Inc.*, 139 S. Ct. at 1900. The PAA clearly stakes out the boundaries of the preempted field in a "public liability action", i.e., laws that are inconsistent with a provision of 42 U.S.C. § 2210 only. This Court has no authority to expand those boundaries and should decline Appellants' invitation to do so.

As the advocate of preemption, Appellants bear the burden of showing that a provision of section 2210 is inconsistent with Missouri state law standards of care. *Cook v. Rockwell Int'l Corp.*, 618 F.3d 1127, 1143 (10th Cir. 2010) (citing *Silkwood*, 464 U.S. at 255). Critically, Appellants do not and cannot point to a single provision of § 2210 which conflicts with state law standards of care because § 2210 does not reference or contain any federal safety standards that could provide the standard of care in a PAA action.

Consistent with the plain language of the PAA's preemption provision, Appellees have alleged a single "public liability action" incorporating standards of care derived from the law of the state where the nuclear incident occurred. Appellants' failure to point to any provision of Section 2210 which is inconsistent with Missouri tort standards of care is fatal to their argument. As the District Court

did, this Court should reject Appellants invitation to ignore the plain language of the PAA.

When Congress has considered the issue of pre-emption and has included a provision explicitly addressing that issue, there is no need to infer congressional intent to preempt state laws. *Cipollone v. Liggett Grp., Inc*., 505 U.S. 504, 517 (1992). "Such reasoning is a variant of the familiar principle of expression *unius est exclusio alterius*: Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." *Id*. Here, the PAA's express preemption language is the best indication of Congressional intent, and the analysis should end here. There is no exclusive, federal standard of care set forth in the PAA.

### C. Supreme Court Precedent Demonstrates No Implied Preemption – The Atomic Energy Act Does Not Preempt State Tort Law

Unable to provide a provision of section 2210 which is inconsistent with applying Missouri tort standards of care, Appellants now urge that this Court ignore the plain language by relying on implied preemption principles which were only "alluded" to and "never developed" in the District Court. App. 384; R. Doc. 85 at 20. This argument is arguably untimely in two respects. It is late because it was not properly developed in the District Court, while also being premature based on the District Court's determination that "by applying ordinary preemption principles, the Court would determine the applicable standard(s) of care". App. 383; R. Doc. 85 at

19. In addition, Appellants argument is contrary to the only Supreme Court decision to address the applicability of state tort law in the context of the Atomic Energy Act and Price Anderson Act, *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238 (1984).

Appellants primarily rely on *Pac. Gas & Elec.Co.*[9] and *N. States Power Co.*[10] to support their newfound[11] implied preemption argument. Aside from predating the statutory language at issue, these cases are distinguishable as they address *direct regulation by a state*[12] and not the issue on appeal here: whether state tort law, which may have some indirect effect on nuclear safety, is preempted by federal law. Critically, less than a year after *Pac. Gas & Elec.Co.*, the Supreme Court did address the issue and further elaborated on Atomic Energy Act preemption in *Silkwood*, 464 U.S. 238.

---

[9] *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190 (1983).

[10] *N. States Power Co.* v. State of Minn., 447 F.2d 1143 (8th Cir. 1971), aff'd sub nom. *Minnesota v. N. States Power Co.*, 405 U.S. 1035, 92 S. Ct. 1307, 31 L. Ed. 2d 576 (1972).

[11] The fact that Appellants cite *N. States Power Co.* for the first in its opening brief to this Court demonstrates the newfound nature of Appellants implied preemption argument.

[12] *Pac. Gas & Elec.Co.* involved a California statute which conditioned the construction of nuclear power plants on findings by the State Energy Resources Conservation and Development Commission. 461 U.S. at 190. *N. States Power Co.* involved conditions imposed by the Minnesota Pollution Control Agency which regulated the level of radioactive discharges and required monitoring programs for the detection of releases. 447 F.2d at 1145.

In *Silkwood*, the estate of a nuclear plant worker brought suit against the plant operator to recover damages for personal injury and property damage caused by radioactive contamination. The matter proceeded to trial where plaintiff's claims were submitted to the jury on alternative theories of strict liability and negligence.[13] The jury returned a verdict in favor of Silkwood, finding actual damages of $505,000 ($500,000 for personal injuries and $5,000 for property damage) and punitive damages of $10,000,000. *Id*. at 241–45.

Following the *Silkwood* jury verdict for plaintiff, defendants filed an alternative motion for judgment n.o.v. or for new trial arguing that "Congress has occupied the field of nuclear regulation through its legislation in the area. Unless defendants' conduct violates appropriate federal standards, or unless defendants may be held liable under federal law, they may not be held accountable in this Court." *Silkwood v. Kerr-McGee Corp*., 485 F. Supp. 566, 571 (W.D. Okla. 1979), *aff'd in part, rev'd in part*, 667 F.2d 908 (10th Cir. 1981), *rev'd*, 464 U.S. 238 (1984). In affirming an award of actual and punitive damages, the district court rejected this argument and determined that:

> Indeed, even cursory analysis of federal law clearly establishes that Congress specifically intended that state common law principles control nuclear accident litigation. Common law duties to act with all due care exist both in the absence of specific regulatory provisions and

---

[13] The district court submitted the claims to the jury on alternative theories in an effort to avoid a new trial in the event that the Court of Appeals disagreed with its ruling on the applicability of strict liability principles.

in conjunction with the federal guidelines for operation of nuclear facilities. It is also abundantly clear that Congress specifically intended that states apply strict liability principles, if available under state law, to liability determinations. Defendants' theory of preemption is simply unsupported by law.

*Id*. at 572.

On Appeal, relying primarily on *N. States Power Co.*, defendants again argued that "the pervasive federal regulation of atomic energy precludes states from applying stricter safety standards for the handling of nuclear materials than required by AEC regulations." *Silkwood v. Kerr-McGee Corp.*, 667 F.2d 908, 920 (10th Cir. 1981), *rev'd*, 464 U.S. 238 (1984). The Tenth Circuit disagreed and determined that "[f]or nuclear incidents below the level of an extraordinary nuclear occurrence… the rules of tort law of the state in which the injury occurred still apply" and that "a state can apply strict liability principles if it chooses." *Id*. at 921. In other words, the Tenth Circuit affirmed the district court's determination that compensatory damages awarded pursuant to strict liability were appropriate. With respect to punitive damages, the Tenth Circuit relied on the reasoning in *N. States Power Co.* and overturned the award of punitive damages because "[a] judicial award of exemplary damages under state law as punishment for bad practices or to deter future practices involving exposure to radiation is no less intrusive than direct legislative acts of the state." *Id*. at 908.

Silkwood appealed to the Supreme Court, seeking review of the Tenth Circuit's ruling with respect to the punitive damages award. The Supreme Court reversed the Tenth Circuit's *N. States Power Co.* based denial of punitive damages and held that the award of punitive damages based on state tort law "is not preempted by federal law." *Silkwood*, 464 U.S. at 258. The Supreme Court reasoned that:

> it is clear that in enacting and amending the Price-Anderson Act, Congress assumed that state-law remedies, in whatever form they might take, were available to those injured by nuclear incidents. This was so even though it was well aware of the NRC's exclusive authority to regulate safety matters. No doubt there is tension between the conclusion that safety regulation is the exclusive concern of the federal law and the conclusion that a state may nevertheless award damages based on its own law of liability. But as we understand what was done over the years in the legislation concerning nuclear energy, Congress intended to stand by both concepts and to tolerate whatever tension there was between them. We can do no less**. *It may be that the award of damages based on the state law of negligence or strict liability is regulatory in the sense that a nuclear plant will be threatened with damages liability if it does not conform to state standards, but that regulatory consequence was something that Congress was quite willing to accept.***

*Id*. at 256 (emphasis added). In other words, *Silkwood* determined that Congress was willing to accept regulatory consequences from the application of state tort law to radiation hazards even though *direct state regulation* of safety aspects of nuclear energy is preempted. *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 176 (1988); *Cook*, 618 F.3d at 1144 ("*Silkwood* recognized Congress's willingness to accept the tension between the federal government's exclusive regulation of nuclear safety and the pre–1988 PAA's incorporation of state-law remedies.").

In *Silkwood*, the Supreme Court directly addressed *Pac. Gas & Elec.Co*. and the implied preemption arguments advanced by Appellants here. With respect to field preemption, the Supreme Court determined that "a review of the same legislative history which prompted our holding in *Pacific Gas & Electric*, coupled with an examination of Congress' actions with respect to other portions of the Atomic Energy Act, convinces us that **the preempted field does not extend as far as [plant operator] would have it**." *Silkwood*, 464 U.S. at 249 (emphasis added). In other words, "insofar as damages for radiation injuries are concerned, preemption should not be judged on the basis that the federal government has so completely occupied the field[.]" *Id*. at 239. With respect to conflict preemption, the Supreme Court determined that compliance with state law standards and compliance with federal regulations "would not appear to be physically impossible" and does not "frustrate any purpose of the federal remedial scheme." *Id.* at 257.

As noted by now Supreme Court Justice Gorsuch in *Cook*, 790 F.3d at 1098, *Silkwood* recognizes that while Congress has authorized the federal government alone to promulgate before-the-fact nuclear safety regulations, it has at the same time done little to forbid the states from indirectly regulating nuclear safety through the operation of traditional after-the-fact tort law. This arrangement is not "remotely unusual. Often Congress entrusts before-the-fact regulation to a federal agency while leaving at least some room for after-the-fact state law tort suits. It has done so in the

field of motor vehicle safety. It has done so in the field of medical devices. And all the statutory evidence before us suggests it has done the same thing here." *Id*. (internal citations omitted).

### D. The 1988 Amendments to the PAA Reaffirm *Silkwood*

Following the Supreme Court's decision in *Silkwood*, Congress passed the 1988 amendments to the PAA. Contrary to Appellants' assertion that "Congress rejected Silkwood's rationale in the 1988 Amendments Act to the PAA and barred punitive damages", Congress reaffirmed *Silkwood's* determination that the Atomic Energy Act does not preempt state tort law for radiation injuries. In response to *Silkwood*, 42 U.S.C. § 2210(s) was added which provides that "[n]o court may award punitive damages in any action with respect to a nuclear incident or precautionary evacuation against a person on behalf of whom the United States is obligated to make payments under an agreement of indemnification covering such incident or evacuation." The plain language chosen by Congress makes it clear that punitive damages are only prohibited when the United States is obligated to make payments under an indemnification agreement.[14]

Congress's determination to limit punitive damages only when the US government is obligated to make payments had no effect on the outcome in *Silkwood*

---

[14] None of the Appellants have an indemnification with the US government for the complained activities.

and it demonstrates Congress's affirmation of the Supreme Court's reasoning and holding. In other words, the 1988 amendments do not reject *Silkwood*, but instead, simply limit its holding in specific circumstances to honor the longstanding policy that the Federal government should not be liable for punitive damages. S. Rep. 100-218, at 12-13 (1987), *reprinted in* 1988 U.S.C.C.A.N. 1476, 1487-88 (emphasis added). Congress's affirmation of *Silkwood* is further demonstrated in the language chosen by Congress when defining a "public liability action", which expressly incorporates state law standards unless inconsistent with a provision of section 2210.

### E.   The District Court Opinion is Consistent with the Uniformity Congress Sought with the 1988 Amendments

Amicus American Nuclear Insurers (ANI) argues that the 1988 amendments "transformed the nuclear liability landscape" and the District Court erred because its decision in contrary to Congress's purpose of ensuring "uniformity in the standard of care for nuclear injury claims throughout the United States." *See* ANI Amicus Brief at 7, 14. However, ANI misinterprets the uniformity sought and makes an argument that is contrary to congressional intent and the plain language of the 1988 amendments.

Congress did not seek to implement a uniform national standard of care as ANI contends, but rather sought to avoid the inefficiencies that followed the TMI accident where "over 150 separate cases against TMI defendants, with over 3,000 claimants, *in various state and Federal courts*." S. Rep. 100-218, at 13 (1987),

*reprinted in* 1988 U.S.C.C.A.N. 1476, 1488 (emphasis added). To avoid this result, Congress "expand[ed] existing law to allow for the ***consolidation of claims*** arising out of any nuclear incident in federal district court." *Id*. (emphasis added). Congress reasoned that the "availability of the provisions for consolidation of claims in the event of any nuclear incident, not just an ENO, would avoid the inefficiencies resulting from duplicative determinations of similar issues in multiple jurisdictions that may occur in the absence of consolidation." *Id*. To accomplish this goal, Congress created a "public liability action" and provided for removal to and subject matter jurisdiction in the federal district court where the nuclear incident occurred. 42 U.S.C. § 2014(hh); 42 U.S.C. § 2210(n)(2). Congress determined that this change was necessary "to ensure the ***equitable and uniform treatment of all victims*** and the coordination of all phases of litigation that could result from a nuclear accident." H.R. Rep. No. 100-104, pt. 2 at 19 (1987).

Contrary to ANI's argument that Congress sought to create nationwide uniformity in all PAA actions, Congress declared that "the substantive rules for decision in [a public liability action] shall be derived from the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of [section 2210]." 42 U.S.C. § 2014(hh). As noted by the District Court, "[d]espite this plain language that Congress did *not* regard state tort law as an

obstacle to achieving its purposes, Defendants seek to preempt all state-law on that exact basis." App. 378; R. Doc. 85 at 14.

Nothing about the District Court's decision is inconsistent with Congress's purpose of providing for the consolidation of cases to ensure the equitable and uniform treatment of all victims of a nuclear incident. Consistent with the 1988 amendments, Plaintiffs have alleged a "public liability action" in the federal district court where the nuclear incident occurred, eliminating the inefficiencies from litigation in multiple forums that Congress sought to avoid.

## F.    Appellants' Interpretation is Contrary to a "Cardinal Attribute" of the PAA: Minimal Interference with State Law

"Since its enactment by Congress in 1957 one of the cardinal attributes of the Price Anderson Act has been its minimal interference with State law. Under the Price Anderson system, the claimant's right to recover from the fund established by the act is left to the tort law of the various States." S. Rep. No. 89-1605, at 6 (1966), *reprinted in* 1966 U.S.C.C.A.N. 3201, 3206. This principle of minimal interference with state law is reflected in each of the amendments to the PAA.

Congress amended the PAA in 1966 to address criticisms and uncertainties associated with "unsettled" law relative to the application of strict liability. To ensure the application of strict liability in the case of a substantial nuclear incident, Congress required licensees to waive defenses that might be available under state law. This approach was deemed a "preferable alternative to enactment of a new body

of Federal tort law" and "in keeping with the approach followed in enacting the original Price-Anderson Act – namely, interfering with State law to the minimum extent necessary." S. Rep. No. 89-1605, at 9 (1966), *reprinted in* 1966 U.S.C.C.A.N. 3201, 3209. Where a nuclear incident is not determined to be an ENO, "a claimant would have exactly the same rights that he has today under existing law -- including, perhaps, benefit of a rule of strict liability *if applicable State law so provides*." S. Rep. No. 89-1605, at 12 (1966), *reprinted in* 1966 U.S.C.C.A.N. 3201, 3212 (emphasis added).

The principle of minimal interference with state law was reaffirmed with the 1988 amendments. More importantly, Congress did so while directly addressing the Missouri case that establishes strict liability for damages resulting from radioactive emissions, *Mallinckrodt, Inc. v Bennett*, 698 S.W. 2d 854 (Mo. Ct. App 1985), *cert denied* 106 S Ct 2903 (1986). In response to the *Bennett* case, Congress was asked to adopt an amendment to the PAA which would exclude public liability claims for damages allegedly resulting from emissions of radioactive material at or below levels permitted by federal regulation. In rejecting the proposed amendment, Congress reasoned that the proposed amendment "would have preempted state tort law by expressly prohibiting suits for damages resulting from emissions of radioactive materials at levels permitted by the NRC, *despite the policy of only interfering with state tort law to the minimum extent necessary—a principle which*

**has been embodied in the Price-Anderson Act for the last 30 years**." H.R. Rep. No. 100-104, pt. 1, at 20 (1987) (emphasis added).

Thus, for decades now, the PAA has revealed Congress's intent to rely on state tort law to establish liability under the PAA. This intent is reflected in the 1988 amendments which expressly incorporates substantive state law for PAA public liability actions. The language chosen by Congress was deliberate and is consistent with the cardinal rule of the PAA – minimal interference with state law. Consistent with Congressional intent, this Court should reject Appellants' attempt to impose an exclusive federal standard of care which is contrary to Congress's goal of minimal interference with state law.

### G. Appellants' Argument is Contrary to NRC Intent and the Primary Purpose of the PAA – Protecting the Public

Appellants argue that "the AEC followed a precautionary standard" when promulgating the federal regulations and imposing a different standard would contradict the judgment that federal regulators reached. Appellant Brief at 31. However, this position is belied by the NRC's own declaration of their intent.

Just as Congress was presented with an opportunity to amend the PAA/AEA to implement federal regulations as the exclusive standard of care, the NRC addressed a similar proposal and just as Congress did, rejected it. The NRC flatly denied a petition asking it to amend its regulations—declining to provide that the Commission's regulations must be violated before a prima facie case is pleaded on

the issues of negligence and causation in any action to recover for injuries claimed to have resulted from exposure to ionizing radiation. *In the Matter of A.N. Tschaeche*, 23 N.R.C. 461 (Apr. 23, 1986). Why? The NRC denied the petition because "it is inconsistent with the intent of the Commission's regulations[.]" *Id.* The NRC explained:

> **Because the AEC did not intend the standards to establish absolute safe levels of exposure below which no injury could occur**, the court concluded that the standards were not dispositive of the issues of negligence or causation. The petitioner urges that the NRC change the intent of its regulations to establish such absolute levels and thereby preclude a finding of negligence if a licensee complies with NRC standards. However, **the Commission has never taken the position that there is a level of radiation exposure below which one can conclusively presume that no injury will result.**

*Id.* (emphasis added). Given the NRC's declared intent, compliance with federal numerical dose standards cannot conclusively establish that no injury will result and is not conclusive proof of the absence of negligence. If Appellants' interpretation is correct, the numerical dose standards would act as a safe harbor from liability for the nuclear industry no matter the circumstances and regardless of whether injuries are caused. This result would be contrary to Congressional intent and the primary concern of the federal government in enacting the PAA – "protection to the people who might suffer damage from the new atomic energy industry." S. Rep. No. 85-296, at 15 (1957), *reprinted in* 1957 U.S.C.C.A.N. 1803, 1816.

It is nonsensical for Appellants to insist that Part 20 standards are the exclusive standard of care in PAA actions, especially when the NRC, itself, omits and will not say that compliance with such standards conclusively establishes that no injury will occur. Appellants' interpretation, which relies on promotion of the nuclear industry at all costs, is clearly inconsistent with the PAA's purpose of protecting the public. As stated by the Supreme Court, the promotion of nuclear power is not to be accomplished "at all costs." *Pac. Gas & Elec. Co.*, 461 U.S. at 222.

## H. Other Circuits Ignore Plain Language and Misinterpret Supreme Court Precedent

Appellants urge that reversal is appropriate because of decisions out of other circuit courts of appeal. As the District Court recognized, these cases are distinguishable because they specifically dealt with entities and facilities licensed by the federal government and do not address applicability of federal regulations beyond that setting. On the contrary, the majority of defendants here were never licensed by the AEC or NRC. These cases also rely on implied preemption principles, an argument Appellants only alluded to, never developed, and the District Court has yet to analyze.

Regardless, a review of the cases cited demonstrates that every decision traces back to a single opinion by the Third Circuit issued after the Three Mile Island accident. See *In re TMI Litig. Cases Consol. II*, 940 F.2d 832 (3d Cir. 1991). As

outlined below, this decision and the ones that follow ignore the plain language of the 1988 amendments and misinterpret Supreme Court precedent:

- **Third Circuit**: In *In re TMI Litig. Cases Consol. II,* 940 F.2d 832, the Third Circuit was the first to find that federal law preempts state tort law in PAA public liability actions. Claiming reliance on *Silkwood*, this decision determined that "the basis of the public liability action no longer stems from state law." Id. at 858. In addition to completely ignoring the plain language of the definition "public liability action", this determination is clearly contrary to the Supreme Court's decision in *Silkwood*, no field or conflict preemption of state tort law. The Supreme Court was clear when it determined that "preemption should not be judged on the basis that the federal government has so completely occupied the field." *Silkwood*, 464 U.S. at 256. It was also clear when it determined that application of state tort law would not impose an obstacle to the full purposes and objectives of Congress. *Id*. at 257-258. As noted above, *Silkwood*'s analysis was reaffirmed with the language chosen by Congress with the 1988 amendments, language which the *TMI* decision completely ignores.

- **Seventh Circuit:** The Seventh Circuit weighed in next and "agree[d] with the Third Circuit in TMI that it is clear from *Pacific Gas & Electric* and from *Silkwood* that state regulation of nuclear safety, through either legislation or negligence actions, is preempted by federal law." *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1105 (7th Cir. 1994). Just as in *TMI*, this decision ignores the plain language of the 1988 amendments and misinterprets *Silkwood* which found that the Atomic Energy Act does not preempt state tort law.

- **Sixth Circuit:** Next, in *Nieman v. NLO, Inc.*, 108 F.3d 1546 (6th Cir. 1997), the Sixth Circuit addressed whether the PAA preempted a plaintiff's state law claim for continuing trespass. The Sixth Circuit "agree[d] with the analyses of preemption in *O'Conner* and *TMI II*" and first determined that "state law claims cannot stand as separate causes of action." *Id*. at 1553. This is irrelevant here where Appellees plead a public liability action under the PAA, not independent state law causes of action. Next, following the flawed interpretation found in *TMI* and *O'Connor*, the Sixth Circuit determined that the "Price-Anderson Act, as amended in 1988, specifically dictates that state law applies only to the extent it is not inconsistent with *federal law*." *Id.* As in *TMI and O'Connor,* this holding is contrary to the

plain language of the PAA which "specifically dictates" that state law applies unless inconsistent with "Section 2210" only, not "federal law". 42 U.S.C. § 2014(hh). It is also worth noting that the holdings in *Nieman* are not related to the standard of care to be applied in a public liability action.

- **Tenth Circuit**: Appellants improperly claim that the Tenth Circuit concluded federal nuclear safety regulations preempt state standards in *Kerr-McGee Corp. v. Farley*, 115 F.3d 1498 (10th Cir. 1997). As with *Nieman*, this case does not even address the standard of care in a public liability action. Instead, this case deals with jurisdiction under the PAA and has no applicability to the applicable standard of care in a public liability action.

- **Eleventh Circuit**: The Eleventh Circuit was the third Circuit to directly address the applicable standard of care in a PAA public liability action. *Roberts v. Fla. Power & Light Co*., 146 F.3d 1305, 1308 (11th Cir. 1998). Relying on the flawed implied preemption analysis from *TMI* and *O'Connor*, the court determined that "any state duty would infringe upon pervasive federal regulation in the field of nuclear safety, and thus would conflict with federal law." Id. As in the cases it relies upon, this determination is contrary to the plain language of the PAA and fails to properly interpret the Supreme Court's decision in *Silkwood* which found that the Atomic Energy Act does not preempt state tort law.

- **Ninth Circuit:** The Ninth Circuit was the next Circuit Court to address the applicable standard of care for PAA public liability actions. *In re Hanford Nuclear Rsrv. Litig*., 534 F.3d 986 (9th Cir. 2008). In failing to conduct an independent analysis of 42 U.S.C. § 2014(hh) and by relying on *TMI* and the decisions that followed, this decision again reaches an interpretation contrary to plain language and Supreme Court precedent.

- **Fifth Circuit:** As with the *Nieman* and *Kerr-McGee Corp.* decisions discussed above, Appellants improperly suggest that the Ninth Circuit concluded federal nuclear safety regulations preempt state standards in *Cotroneo v. Shaw Env't & Infrastructure, Inc*., 639 F.3d 186, 196 (5th Cir. 011). This decision determined that the plaintiffs failed to satisfy their burden of excluding other possible causes of their injuries and held that "plaintiffs' public liability action fails because they have not proven the occurrence of a nuclear incident." Id. at 193,199. In addition to not addressing the applicable standard of care in a public liability action, this

case is irrelevant here where Appellants "do not argue Plaintiffs failed to plead a 'public liability action' arising out of a 'nuclear incident'[.]" App. 372; R. Doc. 85 at 8.

- **Eighth Circuit**: As with many of the cases provided by Appellants, this Court's decision in *Halbrook v. Mallinckrodt, LLC*, 888 F.3d 971, 977 (8th Cir. 2018) does not "conclude[] that federal nuclear safety regulations preempts state standards of care in a PAA action." Appellants Brief at 34. While the Court's holding in *Halbrook* is not related to the standard of care in a public liability action, this decision does indicate that Section 2014(hh) "incorporates substantive state-law for liability." *Halbrook*, 888 F.3d at 974.

A review of the circuit court cases, upon which Appellants ask this Court to follow, demonstrates two things: (1) Not all of the decisions cited by Appellants conclude that federal nuclear safety regulations preempt state standards of care in a PAA action as Appellants claim; and (2) Circuits that decided federal regulations provide the exclusive standard of care all trace back the Third Circuit's decision in *In re TMI Litig. Cases Consol. II,* 940 F.2d 832, which ignores the plain language of the PAA and fails to properly interpret the Supreme Court's decision in *Silkwood*.

Circuit courts that find federal regulations preempt state law standards of liability in a "public liability action" should be scrutinized carefully to avoid an interpretation that is contrary to Supreme Court authority and the plain language of the PAA. The notion that the 1988 amendments changed the Supreme Court's determination that the Atomic Energy Act does not preempt state tort law is simply not supported by the language chosen by Congress when it defined "public liability action".

## I.	The Consequences of Appellants' Interpretation Raises Serious Constitutional Problems

Again, Appellants ask this Court to impose an exclusive duty on all nuclear operators which must be breached before they can be held legally accountable for their actions, regardless of the facts of the case. Accepting this interpretation leads to consequences not intended by Congress. First, it would lead to the elimination of fundamental property rights, raising serious due process concerns. Second, it would also result in federal regulations acting as a safe harbor from liability even for defendants never subject to the regulations.

As Appellants point out, plaintiffs in two related cases have filed public liability actions arising out of the same radioactive materials as here. *See Kitchin v. Bridgeton Landfill LLC*, No. 18-cv-00672, ECF No; *Banks v. Cotter Corp.*, No. 20-cv-01227. Unlike the Appellants here, the *Kitchin* and *Banks* plaintiffs allege property damage claims and incorporate nuisance and trespass theories of liability in their "public liability action." In Missouri, trespass law protects property owners' rights to be free from unauthorized entry upon their property, and nuisance law protects property owners' rights to be free from unreasonable interference with the use and enjoyment of their property. Neither one of these theories of liability requires the showing of fault on the part of a defendant. To prohibit recovery for trespass or nuisance simply because an "exclusive standard of care" has not been breached, would require finding that Congress intended that the AEA and PAA permit nuclear

operators to violate basic property rights as long as they did not release a certain amount of radiation each year. This cannot be the intent of Congress because requiring a breach of duty to establish a claim under the PAA even for property damage claims would mean the elimination of basic property rights such as trespass and nuisance.

A serious constitutional issue emerges, because Missouri property owners' longstanding property rights would be eliminated without providing an adequate substitute remedy. This would be a clear violation of the Due Process Clause of the U.S. Constitution. Such a holding would raise serious questions about whether the PAA is constitutional, and the doctrine of constitutional avoidance counsels that this Court should avoid interpretations raising serious constitutional concerns. See *Almendarez-Torres v. United States*, 523 U.S. 224, 23738 (1998) ("…a statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score."). This Court should avoid the constitutional problem, which now Justice Gorsuch acknowledged in *Cook*,[15] by affirming the District Court's well-founded opinion.

In addition to the possible elimination of basic property rights, Appellants' interpretation would also require finding that non-licensees owe a duty of care that is solely imposed on NRC licensees. In 1957, the AEC promulgated 10 C.F.R. Part

---

[15] 790 F.3d at 1099.

20 to establish standards for protection against radiation hazards arising out of activities under licenses issued by the AEC. 22 Fed. Reg. 548 (1957). In the section labeled "scope", it explicitly states "[t]he regulations in this part apply to all persons who receive, possess, use or transfer byproduct material, source material, or special nuclear material *under a general or specific license issued by the Commission pursuant to the regulations in Part 30, 40, or 70 of this chapter*." 10 C.F.R. § 20.2, 25 Fed. Reg. 10914 (Nov. 17, 1960) (emphasis added). Based on this plain language, these regulations do not carry the force of law with respect to every defendant in this case other than Cotter, the only defendant ever licensed by the NRC. See *In re Hanford Nuclear Rsrv. Litig.*, 534 F.3d 986, 1003 (9th Cir. 2008) (finding tolerance doses "did not carry the force of law and thus cannot provide the basis for a safe harbor from liability"). Plainly stated, there are no federal regulations applicable to the majority of Defendants in this action.[16] Recognizing this fact, the district correctly determined that "[s]urely, the Court cannot hold that non-licensees owe a duty of care that is solely imposed on NRC licensees, as dictated by the plain language of the federal regulations." App 380-381; R. Doc. 85 at 16-17.

---

[16] Appellants note that the PAA provisions providing for omnibus coverage for "persons indemnified" are not applicable here where none of the Defendants maintained financial protection or had an indemnification agreement with the government. See 42 U.S.C. § 2014(t).

## II. Assuming Arguendo That Plain Language is Not Controlling, Plaintiffs Have Alleged Sufficient Facts to Establish a Breach of Federal Regulations

As with Appellants' implied preemption argument, the District Court's Memorandum and Order does not address the sufficiency of Appellees' allegations pertaining to Appellants' breach of federal regulations. App. 365-386; R. Doc. 85. Nonetheless, a review of Plaintiffs' Complaint demonstrates that Plaintiffs have alleged facts to establish federal regulations have been breached.

Assuming *arguendo* that federal regulations provide the exclusive standard of care in a "public liability action", the Court which originally established that rule has determined the following elements must be established: "(1) the defendants released radiation into the environment in excess of the levels permitted by federal regulations in effect [at the time of the alleged nuclear incident]; (2) the plaintiffs were exposed to this radiation (although not necessarily at levels prohibited by those regulations); (3) the plaintiffs have injuries; and (4) radiation was the cause of those injuries." *In re TMI Litig*., 193 F.3d 613, 659 (3d Cir. 1999) (citations omitted), *amended*, 199 F.3d 158 (3d Cir. 2000)). A review of Plaintiffs' Complaint in this action demonstrates Plaintiffs have "alleged sufficient facts to state a claim comprised of these elements that is plausible on its face." *Id*. at *6.

Injuries and causation—the third and fourth elements—are not at issue here. Only the standard of care is. Therefore, Appellees will address the first and second

elements from the *TMI* matter in turn. The answer to both elements is simple though: Plaintiffs have alleged a release of radiation in excess of the levels permitted by 10 C.F.R. §§ 20.105 and 20.106, and Plaintiffs have alleged exposure to this same radiation. Plaintiffs' Complaint therefore cannot be dismissed on these grounds.

### A. Plaintiffs Allege Facts to Demonstrate it is Plausible Cotter Breached Federal Regulations

With respect to the first element set forth in *TMI*, the Eastern District of Missouri determined 10 C.F.R. §§ 20.105 and 20.106 are the applicable federal regulations. *McClurg*, 2017 WL 2929444 at *5. These regulations regulate releases above thresholds in "unrestricted areas", and they do not regulate exposures to individuals. Contrary to Cotter's assertion that Plaintiffs must allege exposure to radiation in excess of these regulations (Appellant Brief at 39), the court confirmed the language of these regulations "does not suggest that a breach occurs only when persons are exposed to excessive radiation. Instead, the regulations provide that a breach occurs whenever excessive radiation is released, whether or not anyone is present in the area exposed." *Id*. at *6. In other words, Plaintiffs are not required to "plead actual exposure in a specific amount." *Id*.

Here, Plaintiffs make numerous allegations that plausibly demonstrate radiation was released in excess of 10 C.F.R. §§ 20.105 and 20.106.

Specifically, Plaintiffs allege that: "Each of these Defendants were lawfully accountable for the property on which the RWM was stored and/or they were

responsible for managing the RWM. All of the Defendants failed in this regard, causing the release of hazardous, toxic, and radioactive substances which have now been physically deposited on surrounding properties by various means including wind, soil, surface water, and groundwater transmission." App. 132; R. Doc. 44, at ¶ 19; "Cotter dried and loaded the RWM onto railcars next to Coldwater Creek at a rate of approximately 400 tons per day." App. 137; R. Doc. 44, at ¶ 47; "The AEC expressed concerns about a dust problem." App. 137; R. Doc. 44, at ¶ 48(A); "The AEC cited Cotter because sample surveys were "totally inadequate to determine concentrations of radioactive materials to which person are exposed pursuant to 10 CFR 20." App. 137; R. Doc. 44, at ¶ 48(B); "The St. Louis County Health Department noted violations related to the restriction of emission of visible air contaminants." App. 137; R. Doc. 44, at ¶ 48(C); "Health and environmental experts expressed concerns and noted violations of AEC regulations." App. 137; R. Doc. 44, at ¶ 48(D); "RWM was washed down under the fence, which was a violation of AEC regulations." App. 137; R. Doc. 44, at ¶ 48(E); "settling ponds were in a state of disrepair." App. 137; R. Doc. 44, at ¶ 48(F); "the drying equipment was in a state of disrepair." App. 137; R. Doc. 44, at ¶ 48(G). "At some point during Cotter's operations at Latty Avenue, its dryer broke down. Thereafter, the site was not secured and appeared to be abandoned." App. 137; R. Doc. 44, at ¶ 49.

Plaintiffs further allege that: "As a result of Cotter's acts and omissions at the

Latty site, Cotter released radiation into unrestricted areas in the environment in excess of the levels permitted by federal regulations in effect at the time, including but not limited to, 10 C.F.R. §§ 20.105 and 20.106." App. 138; R. Doc. 44, at ¶ 52; "As a result of Defendants' acts and omissions described in this Complaint, Defendants released radiation into unrestricted areas in the environment in excess of the levels permitted by federal regulations in effect at the time of their operations." App. 128-29; R. Doc. 44, at ¶¶ 10, 11; "Defendants' negligence throughout the history of the mishandling and improper dumping of hazardous, toxic, carcinogenic, radioactive wastes has resulted in repeated releases of radioactive materials and other hazardous materials onto surrounding property, including the properties where Plaintiffs lived, gardened, and frequented (and where Plaintiff Mazzocchio worked), in disregard of applicable regulations and Plaintiffs' rights." App. 147; R. Doc. 44, at ¶ 112.

That is not all. Plaintiffs further allege that: "on November 13, 1974, the AEC terminated Cotter's source material license." App. 139; R. Doc. 44, at ¶ 59. At this point, the Latty Site became an "unrestricted area" which was defined as "any area access to which is not controlled by the licensee for purposes of protection of individuals from exposure to radiation and radioactive materials." 10 C.F.R. § 20.3(a)(17). Plaintiffs allege that: "[i]n 1977, surveys at the Latty site showed that the site still contained licensable quantities of source material" and that surveys

conducted by the NRC "raised a serious question as to whether statements Cotter Corporation made in its application for termination of its license, with regard to contamination levels and removal of all licensable materials, were correct and, hence, whether the Commission's action terminating your license was founded on accurate representations by you." App. 139; R. Doc. 44, at ¶ 61. Moreover, Plaintiffs allege that: "Cotter's RWM remain on the Latty Avenue site to this day." App. 138; R. Doc. 44, at ¶ 53. The continued presence of Cotter's radioactive wastes at the Latty Site after its license was terminated is also considered a release under 10 CFR 20.105 and 20.106.

Given the numerous factual allegations regarding Cotter's negligent operation at the Latty Site and its improper handling of radioactive materials, Plaintiffs have plead sufficient factual occurrences, which must be accepted as true at the motion to dismiss stage, to demonstrate that Cotter breached the applicable federal regulations and to state a claim that is "plausible on its face." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B. Plaintiffs Allege Facts to Demonstrate it is Plausible Their Exposure Was in Excess of Background

The Eastern District of Missouri also determined the "exposure element [set forth in *TMI*] requires that plaintiffs demonstrate they have been exposed to a greater extent than anyone else, i.e., that their exposure levels exceeded the normal background level." *McClurg v. Mallinckrodt, Inc*., No. 4:12-CV-00361-AGF, 2017

WL 2929444, at *6 (E.D. Mo. July 7, 2017). That is all. A review of the FAC proves that Plaintiffs alleged just that—exposure above background—and that Cotter's assertion that Plaintiffs fail to allege same is without merit.

In short, and as discussed above, Plaintiffs allege that Cotter's negligent operations caused the release of radioactive material onto surrounding properties. Plaintiffs further allege that: "This deposition of RWM on surrounding properties is above the background, it's unique, and readily identifiable from naturally occurring Missouri radiation." App. 132; R. Doc. 44, at ¶ 20; "The properties where Plaintiffs lived, gardened, and frequented (and where Plaintiff Mazzocchio worked) contained radiation above background to which Plaintiffs were exposed." App. 132; R. Doc. 44, at ¶ 21; "Plaintiffs' exposure to *this radiation* above background caused or contributed to cause them to develop cancer. App. 132; R. Doc. 44, at ¶ 22 (emphasis added); "As a result of Cotter's acts and omissions at the Latty site and Cotter's releases, Coldwater Creek and surrounding properties, including the properties where Plaintiffs lived, gardened, and frequented (and where Plaintiff Mazzocchio worked), were contaminated with radioactive materials in excess of background levels." App. 138; R. Doc. 44, at ¶ 52. These allegations are more than sufficient to establish the second element.

**C. As Plaintiffs Have Alleged *TMI*'s Elements One and Two Sufficiently, the District Court was Incorrect in Stating a Reversal Based on a Federal Standard of Care May Allow for Dismissal of Plaintiffs' Complaint**

Without meaningful explanation and without any citations to the operative Complaint, the District Court improperly stated a belief that reversal would result in dismissal of this matter. Memo and Order, pp. 3, 5 (stating "resolution of the standard of care, and the potential imposition of Defendants' proposed standard, would lead to the dismissal of the action" and "an immediate appeal of the issue would allow for the potential termination of the matter".). As this Court can see based on its *de novo* review, a reversal would not—in fact, it could not as a matter of law—result in a dismissal of this matter. Plaintiffs have alleged sufficient facts to show breach of the federal regulations in effect at the time of the alleged nuclear incident *and* Plaintiffs' exposure to this radiation. *In re TMI Litig.*, 193 F.3d at 659. As such, Plaintiffs' Complaint survives the underlying motions to dismiss.

## CONCLUSION

For the foregoing reasons, the District Court's decision should be affirmed.

Dated: May 8, 2024                    Respectfully submitted,

                                       KEANE LAW LLC

                                       */s/  Ryan Keane*
                                       Ryan A. Keane, #62112
                                       Tanner A. Kirksey #72882
                                       7711 Bonhomme Ave., Suite 600

St. Louis, MO 63105
314-391-4700
314-244-3778 (fax)
[ryan@keanelawllc.com](mailto:ryan@keanelawllc.com)
tanner@keanelawllc.com

COOPER LAW FIRM, L.L.C
Celeste Brustowicz, LA Bar # 16835
Victor Cobb LA Bar # 36830
1525 Religious Street
New Orleans, LA 70130
Phone: (504) 566-1558
cbrustowicz@clfnola.com
vcobb@clfnola.com

JOHNSON GRAY, LLC
Anthony D. Gray, #51534
2705 Dougherty Ferry Rd. Suite 100
St Louis, MO 63122 (314) 385-9500
agray@johnsongraylaw.com

and

THOMPSON BARNEY
Kevin Thompson (WV Bar # 5062)
David R. Barney, Jr. (WV Bar #7958)
2030 Kanawha Boulevard,
East Charleston, WV 25311
Telephone: 304-343-4401
Facsimile: 304-343-4405
Email: [kwthompson@gmail.com](mailto:kwthompson@gmail.com)

*Attorneys for Plaintiffs/Appellees*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 8, 2024, a true and accurate copy of the foregoing was served by filing it in the court's electronic filing system, which will provide electronic notice and a copy of the filing to all parties and attorneys of record.

*/s/ Ryan Keane*
Ryan A. Keane

*Attorney for Plaintiffs/Appellees*

**CERTIFICATE OF COMPLIANCE**

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5), the type-style requirements of Fed. R. App. P. 32 (a)(6), and the Type-Volume Limits of Fed. R. App. P. 32 (a)(7)(B). This document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font Times New Roman type style. According to that word processing system, this document contains 12,874 words, excluding parts of the document exempted by Fed. R. App. P. 32(f). The brief has been scanned for viruses and is virus free. *See* 8th Cir. R. 28A(h).

*/s/ Ryan Keane*
Ryan A. Keane

*Attorney for Plaintiffs/Appellees*